## PARCELL v. UNITED STATES.
### Civ. A. No. 1153.

United States District Court
S. D. West Virginia, Charleston Division.
Nov. 23, 1951.

Campbell, McClintic, James & Wise, Ernest K. James and Ben K. Baer, Charleston, W. Va., for plaintiff.

A. Garnett Thompson, U. S. Dist. Atty., C. Berkley Lilly, Asst. U. S. Atty., Charleston, W. Va., for defendant.

MOORE, Chief Judge.

On March 21, 1950, two jet fighter planes took off from Kirtland Air Force Base, Albuquerque, New Mexico, on a routine flight to Washington, D. C., and return. One of the planes was operated by Lieutenant Colonel Arthur F. Reinhardt and the other by Captain George W. Evans, Jr. Both men were pilots in the United States Air Force. One plane had been flown a total of 101 hours; the other a total of 130 hours. Reinhardt was 45 years old. He had flown a total of 4,710 hours, with 25 hours of actual combat time. Evans was 37 years old and had flown a total of 2,329 hours, of which 244 hours were in actual combat. Both pilots were qualified for instrument flying, and both planes were equipped for such flying.

Colonel Reinhardt's last routine physical examination was in October, 1949, and Captain Evans' in November, 1948, at which time both were found qualified for flying. The last known inspection of the planes was made at Kirtland Air Force Base.

Colonel Reinhardt, who was in charge of the flight, had authority from his superiors in the United States Air Force to plan and execute flights at his own discretion, without clearance from any airport authority.

The flight was made in formation, Colonel Reinhardt acting as lead pilot and Captain Evans as wing pilot; this being standard procedure followed in connection with routine flights of jet fighter planes, inasmuch as one of the primary reasons for such flights is to give the pilots training and practice in formation flying.

The planes reached Washington, D. C., and returned as far as Charleston, West Virginia, on the same day they took off from Albuquerque, New Mexico. They were landed at an airport near Charleston and the pilots spent the night in that city. At 12:17 P.M. the following day, the two planes took off in formation from the airport near Charleston. The flight plan was that the planes should attain and maintain an altitude of 500 feet above the clouds, at an air speed of 500 miles per hour. The ceiling at Kanawha Airport at noon on March 22, 1950, was approximately 3,000 feet, the visibility was four to five miles, and there were light rain showers. The velocity of the wind was eight to ten miles per hour, south by southeast.

An employee of the airport traffic control system directed Colonel Reinhardt, as flight leader, to climb at an approximate rate of 5,000 feet per minute and to report upon leaving an altitude of 10,000 feet. It was observed that the planes began their flight with a normal angle of climb until they were lost to sight. Neither Colonel Reinhardt nor Captain Evans reported after take-off. Between two and three minutes after the take-off from the airport,

both planes crashed about 229 feet apart on a hillside near plaintiff's residence and on his land, which lies approximately 15 miles south of the airport. The evidence does not establish which plane crashed in which spot. A line drawn between the two places of impact and extended points approximately in the direction of the airport. Along this line and for a distance of approximately 3,000 feet towards the airport were scattered small parts of the wreckage of both planes, no single piece weighing more than ten pounds. Both pilots were killed in the accident and both planes completely demolished. There was a severe explosion and this, coupled with flying debris, did considerable damage to the dwelling house, the barn, and the chicken houses of plaintiff. Large craters were created at the spot where each of the planes hit the ground. Almost directly above each crater two sets of high tension wires were cut.

The elevation above sea level at the airport is 985 feet. The elevation at the site of the crash is 900 to 1,000 feet.

One corner of the house frame was moved from the foundation wall. One side wall was bulged out so that it had to be later supported by poles to keep it from falling. Many of the rafters were split. The windows were broken. Parts of the chimney and roof were damaged. The house generally was strained and some portions of it pulled apart; but plaintiff and his family continued to live in it up to the time of the trial The concrete foundation of the barn was shaken and broken. One chicken house was demolished and another damaged.

This action arises under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671, et seq. With certain limitations not material here, the Act makes the United States liable for torts committed by its officers, agents, and employees to the same extent as if it were a private person, under the law of the place where the act or omission may have occurred.

The complaint is founded on negligence, which plaintiff says is logically inferrable both from the circumstances shown in evidence, and also by use of the res ipsa loquitur doctrine. Another theory, evolved at the trial, on which plaintiff relies, is the principle of absolute liability for damages caused by the use of an inherently dangerous instrumentality or by an extra-hazardous activity.

As is so often the case in this type of accident, direct, specific, and positive evidence pointing to what actually happened has been eliminated by the fatal crash. There were no eyewitnesses. Tongues that might otherwise have told were silenced. The independent circumstances left in the wake of the accident are insufficient in themselves to charge defendant with negligence. We must resort to a presumption or inference attached by law to the collective circumstances; else we are left in the field of speculation and conjecture. The doctrine of res ipsa loquitur, if applicable, supplies this legal inference.

■ Whether the doctrine of res ipsa loquitur is applicable, and what the effect thereof may be once it is applied, are questions to be determined by the standards and tests of local law. 28 U.S.C.A. § 1346(b); Lachman v. Pennsylvania Greyhound Lines, Inc., 4 Cir., 1947, 160 F.2d 496. West Virginia's highest court has not had the precise question involved here before it. Hence, it devolves upon me to endeavor to reach a proper conclusion in the light of analogous West Virginia decisions, decisions of federal courts and courts in other states, and from the general field of jurisprudence.

■ The West Virginia Supreme Court of Appeals has applied res ipsa loquitur to a variety of facts and circumstances, e. g., a falling electrical wire, Snyder v. Wheeling Electrical Co., 43 W.Va. 661, 28 S.E. 733, 39 L.R.A. 499; a railroad common carrier, Thomas v. Monongahela Valley Traction Co., 90 W.Va. 681, 112 S.E. 228; impure foods, Holley v. Purity Maid Baking Co., 128 W.Va. 531, 37 S.E. 2d 729, 167 A.L.R. 648. The three essentials for the application of the doctrine in West Virginia and under the cases generally are: (1) the thing which caused the injury must have been under the ex-

clusive control of the defendant; (2) the injury must have been such as in the ordinary course of events does not occur if the one having such control uses proper care; and (3) the person injured must have been without fault. Bice v. Wheeling Electrical Co., 62 W.Va. 685, 59 S.E. 626.

There is no question that requirements (1) and (3) are satisfied. Defendant admits that it had exclusive control of the two airplanes through its agents and that plaintiff was without fault. The second essential is not quite so clearly discernible here. As defendant points out the causes of many airplane crashes are unknown, and may be the products of a number of unascertainable factors. The cases treating this problem are somewhat conflicting, and accordingly bear analysis.

In D'Anna v. United States, 4 Cir., 1950, 181 F.2d 335, a gas tank fell from a Naval airplane and damaged plaintiff's fruit stand. The case was decided under a Maryland statute, which imposed prima facie liability on the owner of aircraft for injury to property or persons caused by objects falling from a plane, or the plane itself falling. Judge Parker, in discussing liability under the statute and the application of res ipsa loquitur generally, uses the following language:

"The res ipsa loquitur rule, however, is clearly applicable to situations such as this (citing cases involving railway accidents and Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815) and justifies a finding of liability, as does the statute, unless the burden which the statute imposes is met by an adequate showing that the injury was not due to negligence. Such burden is easily met where it can be shown that the falling object was dropped from the plane by a passenger or other person over whom the operator of the plane had no control. It is more difficult to meet where the plane itself or an object attached to it crashes to the ground and inflicts injury; for the falling in such case is the strongest sort of proof of either negligent operation or defective con-

struction or equipment." 181 F.2d at page 337.

In Smith v. Pennsylvania Central Airlines Corp., D.C.D.C., 1948, 76 F.Supp. 940, 6 A.L.R.2d 521, plaintiff's decedent was killed when defendant's passenger plane crashed in West Virginia on a flight from Pittsburgh to Washington. The principal question before the court was the applicability of the doctrine of res ipsa loquitur to an airplane crash under West Virginia law. Lacking direct West Virginia authority on the point involved, Judge Holtzoff nevertheless decided that this doctrine is as applicable to air common carriers as it is and has been since 1844 to railroad common carriers. He rejects defendant's contention that air accidents may happen even when reasonable care is exercised, and that therefore the doctrine should not be applied, saying:

"That airplane crashes may occur as a result of the action of the elements, or without any carelessness or deficiencies on the part of any human being, is no doubt true. This is also probably the case in connection with railroad wrecks." 76 F.Supp. at page 944.

It is true that Judge Holtzoff places special emphasis on the fact that the airplane involved was a common carrier. The reasoning nevertheless has force here.

In 6 Am.Jur. (Rev.Ed.), Aviation, § 77, the rule is found: "The doctrine (of res ipsa loquitur) has been held applicable in various other types of aviation accidents, including collisions with other aircraft in flight, Smith v. O'Donnell, 215 Cal. 714, 12 P.2d 933 * * * and with structures or objects on the surface, Genero v. Ewing, 176 Wash. 78, 28 P.2d 116 * * *"

A number of courts have refused to apply the doctrine of res ipsa loquitur to airplane accidents. Morrison v. LeTourneau Co., 5 Cir., 1943, 138 F.2d 339; Cohn v. United Air Lines Transport Corp., D.C. Wyo. 1937, 17 F.Supp. 865; Smith v. Whitley, 1943, 223 N.C. 534, 27 S.E.2d 442; also Hall v. Payne, 1949, 189 Va. 140, 52 S.E.2d 76. (Although the doctrine of res ipsa loquitur was not put directly in issue, the

court's language in the case last cited was broad enough to exclude its applicability.) All of these cases, however, involved the death of passengers in the crash of private planes.

I have not found nor has there been cited to me any case in which a court refused to apply the doctrine of res ipsa loquitur to the collision of aircraft in flight with structures or objects on the ground. In those cases just cited in which res ipsa loquitur was said to be inapplicable, their facts show that two of the three requisites, namely, exclusive control and want of contributory negligence, were not proved. For example, in Morrison v. LeTourneau Co. plaintiff's decedent, a passenger, was killed when a two-seater private cub plane crashed into a mountain side. The plane was equipped with dual controls and dual ignition switches. Both switches were on when the plane was found. In Hall v. Payne the pilot and his thirteen year old passenger were killed in the crash of a rented plane with dual controls. The passenger's administratrix sued. In both the Hall and the LeTourneau cases it was possible and even probable that the passengers were piloting the planes. Hence, contributory negligence and lack of exclusive control are not negatived, as they are when an aircraft in flight strikes persons or property on the ground. The absence of exclusive control by the defendant and of due care on the part of the injured person are to a greater or less degree contributing factors in all of the passenger cases denying the applicability of res ipsa loquitur.

One of the reasons most echoed in the decisions for denying the inference created by res ipsa loquitur, and one upon which defendant in this case relies is: It cannot be said that accidents involving a plane do not ordinarily occur but for negligence; for the accident may have been caused by any one of a number of circumstances over which the owner or operator had no control. Herndon v. Gregory, 1935, 190 Ark. 702, 710, 81 S.W.2d 849, 852, 82 S.W.2d 244; Hall v. Payne, supra; Morrison v. LeTourneau Co., supra. If one were to follow this logic to its ultimate conclusion,

there would be few cases indeed in which the doctrine could ever be applied. It is because the facts surrounding the accident and the cause thereof *are* unknown that a plaintiff seeks the benefit of a legal inference or presumption. An accident known to grow out of one set of circumstances and no other would supply a plaintiff with good and sufficient evidence in itself, without the aid of a rule of law based on probabilities.

■ West Virginia is committed to the view that res ipsa loquitur does not create a conclusive presumption of negligence, nor does it compel such an inference. It merely gives rise to a permissible inference of fact, and calls upon the defendant for an explanation. Defendant is not charged with a liability that otherwise did not exist. If he be in fact not guilty of negligence, he may exculpate himself by accounting for the accident. It does not shift the burden of proof. Even in the absence of a satisfactory explanation, the trier of fact is not required to charge the defendant with negligence. Holley v. Purity Maid Baking Co., supra; following Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815.

■ I believe the better logic and the weight of the decided cases support the application of the doctrine of res ipsa loquitur to an airplane crash damaging property on the ground.

Since the effect of res ipsa loquitur in West Virginia is that the inference created may or may not sustain a verdict, Holley v. Purity Maid Baking Co., supra, it becomes material to examine the facts in this case to ascertain whether or not the inference charging defendant with negligence can be properly drawn.

It is difficult to conceive that these high speed planes flying in formation had not collided in the air, since they crashed so close together on the ground, and the intermingled parts were left strewn in the direction from which, as I will point out, they approached the scene of the accident. Of course there is a possibility that both planes from some unknown cause exploded simultaneously; but this assumption sets at

naught the law of probability. Neither can I accept another possible cause advanced by defendant; that the lead pilot, experiencing vertigo, led the wing pilot into the ground. This theory does not explain the trailing debris in the direction of the airport, nor is it probable that the wing pilot could not have apprehended his peril in time to avoid disaster, especially when, with a ceiling of 3,000 feet, he could see the ground from that distance above it. I am led towards the conclusion that the two planes collided in mid air. During the trial of this case I made some comment indicating an opinion that the line of debris was a circumstance strongly tending to show that the planes had turned around in an attempt to get back to the airport. I am convinced now that my comment was uncalled for. The direction of the line of strewn particles was from the point of impact northerly towards the airport, which indicates to my mind that it was caused by the collision of the planes prior to the major crash and that, as disintegration ensued, loosened pieces fell to the earth creating a trail of wreckage. It is highly improbable that this 3,000 foot trail was caused by the exploding planes after the crash. Had they been flying northerly towards the airport, the momentum of the planes would indeed have propelled the fragments forward; but this possibility is overcome by the circumstance that the ground sloped up in that direction. The falling planes, if headed northward, must necessarily have described an angle with the hill side approaching a right angle. It seems inconceivable that in these circumstances pieces of the planes could have been thrown forward and up the hill for a distance of more than half a mile.

If it be assumed that the planes collided in flight, it is reasonable to conclude that there was negligence on the part of the United States. Obviously one plane must have been out of control, either due to acts of the pilot or to defects in its mechanical condition. (Two planes would hardly be out of control at the same time.) If it can be said that the defect causing the one pilot to lose control was due to some cause other than his negligence, and that such is true in many cases, then pilots proceeding in formation knowing of such danger are taking an unnecessary risk and are not exercising the degree of care required in such circumstances.

Other independent features add to the res ipsa loquitur inference, though insufficient in themselves to furnish ground for a finding of negligence. The planes were not inspected or checked before leaving the airport. They took off in formation. They were cleared by the air traffic control on the implied condition that the lead pilot accept responsibility for the greater than normal hazards of collision involved. The weather was unfavorable for flying although not prohibitive.

The United States has not explained away, rebutted, or nullified the inference of negligence permitted by res ipsa loquitur. In the main its evidence shows that each pilot at his last routine physical examination was found qualified for flying, and that each plane had been given a routine inspection before leaving its home base at Albuquerque, New Mexico. Evidence of routine physical examinations and routine inspections of the plane does not overcome the inference. See D'Anna v. United States, 4 Cir., 1950, 181 F.2d 335, 337. In addition to the above, possibilities were advanced that the planes may have developed mechanical trouble; that the instruments may have failed; that "snow" or fog may have been created in the cockpit; that the parts may have caught fire; or that one or both of the pilots may have experienced vertigo. I deem mere possibilities insufficient to overcome the inference supplied by the doctrine of res ipsa loquitur. The concept of such a doctrine would be of little value to a plaintiff if defendant could defeat his case by introducing evidence to the effect that the accident *might* have happened in this way or that.

Plaintiff is entitled to a judgment.

I am further of opinion that the principle of absolute liability is applicable in the circumstances of this case.

Defendant contends that it is not absolutely liable for the damage suffered by

plaintiff, advancing two principal arguments: first, that a standard of absolute liability is not imposed by West Virginia law; and secondly, that irrespective of local law, absolute liability is not within the purview of the Federal Tort Claims Act.

■ I have had occasion recently to examine the West Virginia law pertaining to absolute liability in another decision; Britton v. Harrison Const. Co., D.C.W.Va. 1948, 87 F.Supp. 405. I held there that although the West Virginia court had in no case clearly imposed absolute liability, it nevertheless had not denied its applicability in a proper case. Since under the common law a defendant is liable irrespective of negligence for damages resulting from a trespass *quare clausum fregit* caused by concussions and vibrations set in motion by a dynamite explosion, I concluded that the defendant there was absolutely liable. The problem here is somewhat similar to that presented in the Britton case. West Virginia's highest court has not yet had to deal with a case involving damage to property on the ground by airplanes flying overhead. Judge Parker of the Fourth Circuit Court of Appeals states the common law rule in D'Anna v. United States, supra [181 F.2d 337]:

> "One who flies an aeroplane is opposing mechanical forces to the force of gravity and is engaged in an undertaking which is fraught with the gravest danger to persons and property beneath if it is not carefully operated or if the mechanism of the plane and its attachments are not in first class condition. At common law, the hazardous nature of the enterprise subjected the operator of the plane to a rule of absolute liability to one upon the ground who was injured or whose property was damaged as a result of the operation. A.L.I. Restatement Torts secs. 519, 520, d; Prosser on Torts p. 452."

■ Defendant contends that the above quotation from the D'Anna case is merely dictum in view of the Maryland statute which imposed only prima facie liability.

This may or may not be true. I nevertheless believe it to be a correct statement of the common law as to the liability of an operator owner for damages caused by falling aircraft. West Virginia has not changed the common law rule by court decision or by statute.

■ Defendant's argument that the United States is not, under the language of the Federal Tort Claims Act, absolutely liable for a tort of this kind is without merit. Under Sec. 1346(b) of the Act the United States is made liable for " * * * loss of property, or personal injury or death caused by the negligent *or wrongful* act or omission of any employee of the Government * * *." (Emphasis added.) The words, "wrongful act," in that portion of the statute set out above must be given some meaning. To say that "wrongful act" is a tautological phrase meaning negligence is inconsistent with the general rule of statutory interpretation, namely, that no portion of a statute susceptible of meaning is to be treated as superfluous. See Hurley and Comi v. United States, 4 Cir., 192 F.2d 297.

In 45 Words and Phrases, p. 627, many cases are cited in which the phrase "wrongful act" has been interpreted to mean any act which in the ordinary course of events infringes on the rights of another to his damage. In Boyce v. United States, D.C. Iowa, 1950, 93 F.Supp. 866, and D'Anna v. United States, supra, it was assumed that "wrongful act" includes those acts for which the United States may be absolutely liable. To say that a tort giving rise to absolute liability is not a "wrongful act" would be a technical refinement of language incompatible with that liberal interpretation of the sovereign's waiver of immunity which the highest court in the land has admonished us to employ. See United States v. Aetna Casualty & Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171; United States v. Yellow Cab Co., 1950, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523.

■ The evidence of damage is conflicting. Estimates range from $901.06 as given by one of defendant's witnesses to $8,800 as testified to by plaintiff himself.

After carefully considering and weighing the evidence, including the age of the house, its previous condition, its cost to plaintiff, improvements made by him, its prior and subsequent market value, the cost of repairs, and all the other evidence relating to damages, I find that $2,500 is a just and adequate sum to compensate plaintiff for all damages to his property caused by the crash of the planes.

An appropriate order may be entered in accordance with this opinion.