# Richmond

## Pauline W. Hall, Adm'x, etc. v. George W. Payne, Adm'r, etc.

March 7, 1949.

Record No. 3419.

Present, All the Justices.

The opinion states the case.

*Sanford & Clement,* for the plaintiff in error.

*Crews & Clement, H. H. Watson* and *Fielding L. Wilson,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

This action is based upon an airplane accident in which the two occupants of the plane were killed. The main question presented is whether there was sufficient evidence of negligence on the part of the pilot to sustain a jury verdict in favor of the plaintiff for $5,000.

The plaintiff was the administratrix of Edwin Winn Hall, her son, a boy thirteen years old. The defendant was the administrator of Guy H. Carrington, a young married man twenty years old.

A few days before the accident, Carrington received

his license as a private pilot. On the day of the accident, August 7, 1947, he secured a yellow cub trainer plane from Southern Airways at the Danville Airport, near Danville, and invited Edwin to take a ride with him. They left the airport at about one o'clock, flew over Danville where they gave a prearranged signal to one of Edwin's playmates, and then flew west. The plane was next sighted a few minutes before the crash, headed southwest toward the Dan river at an estimated altitude of about 1,000 feet. Just before the crash it was seen still going toward the river at an altitude of at least 500 feet.

Three witnesses for the plaintiff testified they saw the plane fall. The place where it fell was near the home of one of the witnesses, Mrs. Mize, just east of Vandola road, about ten miles west of the airport.

A few feet south of the Mize home is a plantation road, which leads into the Vandola road from the east. About 120 feet south of the plantation road, and practically parallel with it, are some electric light wires.

Mrs. Mize was walking westwardly along this plantation road toward her home when she saw this plane coming in from the north, to her right, and flying "rather low." It was then west of her and as it went by, a tree in front of her house hid it from her view. The plane made two circles, in what she described as "somewhere about ten minutes," and then came toward her from the south, over the Trammel home, about a quarter of a mile away. It then seemed to be about the same height as when she first saw it. As it came toward her from the Trammel house "it gradually got lower and lower," passing 30 or 35 feet over the top of the wires, which she estimated to be about 25 feet from the ground, crossing the plantation road at a height she estimated to be about 20 feet, and striking the ground 36 feet beyond the road. She said when the plane came over the wires it was losing altitude and falling to the ground. It came straight at her, until it got almost to her, when it seemed to drop the wing next to her, its right wing. She fell down "and when I turned around, the propeller was

sticking in the ground." The plane had turned upside down, with its nose pointing south, the direction from which it came, and about two minutes later it burst into flames. The plane was destroyed and both of its occupants were burned beyond recognition.

Another witness, who saw it fall, said "it aimed to go up and turned and came straight down." The third eye-witness for the plaintiff said when the plane started on its circles it was "right high," but it got lower all the time.

The area over which the plane was circling was rough, wooded land. The spot where it fell was described as "within ten feet of being the highest spot anywhere around there." The slope there was to the north, the direction the plane was going, with trees directly in front only 15 or 20 feet away from where the plane fell.

Mrs. Mize said as the plane approached on its last trip the motor was running until it got to the Gammon house, which other testimony placed at about one eighth of a mile away, and from there it hit one time, "it just buzzed," or made "a whistling sound." Mr. Mize was in his barn and did not see the plane before it crashed, but said he heard it and that it circled twice and it sounded like the motor was running perfectly, and on the third trip "it either cut off or he cut it off," but he said he did not know anything about an airplane.

A witness for the defendant, who saw the accident, testi-fied that the plane came over her house at "about average height;" that it flew around a little over her yard, then went toward the Gammon house; that at that time "it was popping and just looked like it was going to fall anyway;" that it was making a noise like a car backfiring, "just a regular spluttering."

An expert witness for the plaintiff testified that 300 feet to the west, between the scene of accident and the road, there was a place where he thought it was possible to get a cub plane in without damage, and that there were other spots in that vicinity where it would have been possible to land an airplane of that type. He gave it as his opinion

that the motor had power on when the plane struck, and that when the plane fell it was either in a stall (described as losing forward speed below the minimum required to keep in the air), or that the pilot was diving intentionally at the ground. There was evidence that a safe altitude for flying over that particular terrain was not less than 500 feet, which was the altitude required by the rules of the Civil Aeronautics Board.

The plane was two-seated, equipped with dual controls; that is, one seat was behind the other, and both seats had controls which were connected together, so that when one control was worked the other worked with it. It was testified that if the plane was being piloted from the front seat, it was possible for the occupant of the rear seat to cut off the ignition, and he could likewise move the control stick the same as the pilot could.

The contention of the plaintiff is that the plane was flown too low, and at a dangerous altitude, for as long as ten minutes, with the motor running; that the jury could infer this was negligently done, and that such negligence was the proximate cause of the accident.

The court instructed the jury at the instance of the plaintiff, in substance, that it was the duty of Carrington to exercise the degree of care that a competent, prudent and qualified pilot would use; and that if he "wilfully and voluntarily" operated the plane in a careless or reckless manner, or, "at an altitude of not less than 500 feet, except over water or areas where flying at a lower altitude will not involve hazard to persons or property on the surface," he was guilty of negligence.

The words "wilfully and voluntarily" were added to the instruction over the objection of the plaintiff, but no complaint of that is here made.

At the instance of the defendant, and without objection, the jury were instructed that the law presumes that Carrington was operating the plane with ordinary care, and that the burden was on the plaintiff to prove that he was guilty of negligence which was a proximate cause of the accident;

that no verdict should be based on conjecture, and if the jury were unable to say who or what was the cause of the accident, they must find for the defendant.

These principles have, therefore, become the law of this case.

As stated, the jury returned a verdict in favor of the plaintiff, which, on motion of the defendant, the trial court set aside and entered final judgment for the defendant, on the ground that the evidence failed to establish negligence on the part of Carrington which was a proximate cause of the accident. In a written opinion, the able judge of that court said, in part:

"It will be conceded that it would have been negligent for this pilot to have 'intentionally and voluntarily' flown his plane at this altitude over this rough wooded section of Pittsylvania county. No witness attempts to say that the plane was 'intentionally' being flown this low. The expert witness, Lovelace, did not see the crash and his evidence cannot rise higher than the witnesses who did see it. At the end of the plaintiff's evidence, the Court had the abiding feeling that something had gone wrong with this plane and the same continued to lose altitude until it finally crashed to the ground. As observed by the Court during the argument on the instructions * * * 'the outstanding belief in my mind is that this man (Carrington) had gotten over this point when this plane crashed, and was simply groping with death over there, and was doing everything he could do to come out of a situation—whether he had gotten into it through his own negligence or through some mechanical failure of the plane, I don't know; and I don't think that question has ever been proven.'

"Probable causes of this crash could be catalogued and they would be many, if we desired to enter the field of conjecture and speculation—but you cannot justly try law suits in this fashion. The cause of this crash has not been proven, no negligence of the pilot has been shown which was the proximate cause of the accident and the verdict of the jury cannot stand."

■ We think this record warrants that statement and requires that conclusion.

It is not contended that the doctrine of *res ipsa loquitur* applies under the facts shown. It was testified by a witness for the plaintiff that Carrington was a little better than average as a student pilot, and very conscientious in his application of the rules of flying. There was no suggestion that he was stunting or doing acrobatics. The plaintiff argues that the jury had a right to say that Carrington flew at the low altitude for no purpose other than to attract the attention of people on the ground, or to impress the boy passenger with his skill and daring, or to frighten Mrs. Mize, or that he realized he was too low to clear the trees in front of him and tried to climb too steeply. But any of these conclusions would be an inference based on the premise that Carrington was flying that low purposely, rather than of necessity, which is itself an inference and not a fact established by the evidence.

Plaintiff's expert witness gave it as his opinion that Carrington was not trying to land at the point where his plane struck. The terrain at that point, with the trees so close in front of him, lends credence to that opinion. This witness also expressed the thought, as stated, that Carrington either intentionally dived at the ground or the plane was in a stall. To agree with the first alternative would be to presume, against the first law of nature, that he intended self-destruction. It would be more reasonable to surmise that the stall was the cause of the crash. The evidence might be said to suggest that the stall occurred when Carrington made a last effort to nose the plane over the trees in front of him. But Mrs. Mize said the plane was falling when that occurred, and the question is still unanswered as to the cause of that. There was testimony from plaintiff's witnesses, and it is a matter of common knowledge, that airplanes fall from causes that are not ascertained. The motor may fail, or other mechanical trouble may develop. One of the experts said he guessed he had had fifty forced landings, and that the most common cause of that was power failure. Here there

was the additional element that the occupant of the rear seat could have interfered with the power or with the handling of the plane. There is affirmative evidence that there was something wrong with the motor, but aside from that there is no fact proved from which a legitimate inference could be made that the crash was caused by any act of negligence on the part of Carrington. Looking to the evidence and all proper inferences to be drawn from it, it is still a matter of conjecture as to what caused this unfortunate accident.

To prove a possibility only, or to leave the issue to surmise or conjecture, is never sufficient to sustain a verdict. *Michigan Aero Club* v. *Shelley,* 283 Mich. 401, 278 N. W. 121. In that case Hickey had obtained custody of the plane and permission to fly it. It was equipped with connected dual controls and a stick was present in the rear cockpit. The plane crashed and Hickey was found dead in the front cockpit, with Madyck in the rear cockpit fatally injured and unconscious. In denying a recovery to the owner of the plane against Hickey's estate, the court said the crash might have been caused by the negligence of Madyck, who might have moved the stick in such a way as to nose the ship toward the ground, or he might have been flying the plane and pulled the stick the wrong way, or something might have happened to the motor, and that there was nothing except guessing and conjecture to indicate that Hickey was negligently operating the plane.

*Towle* v. *Phillips,* 180 Tenn. 121, 172 S. W. (2d) 806, has points of similarity to the case in hand. There Webb had a new plane and asked Towle to go with him for a ride. The plane got up safely, flew for a short distance, then returned and circled around the field at a rather low altitude, when it seemed to go straight up, then stalled, dipped or tilted slightly to one side and fell to the ground with the engine running at considerable speed. Both occupants were instantly killed. In denying a recovery to Towle's widow, the court said:

"No doubt the vertical climb was the proximate cause of

the crash. On the record before us it may have been caused by Webb's handling of the controls available to him, or by Towle's handling of the controls available to him, or it may have been caused by something not explained, for which neither man was responsible. It would be a guess to say that Webb's negligence was the responsible agency."

*Morrison* v. *Le Tourneau Co.,* 5 Cir., 138 F. (2d) 339, 341, involved, also, the crash of a two-seated, dual-controlled, cub plane, which fell and killed its pilot, Le Tourneau, and Morrison, the passenger. The court there said that no one could answer a number of stated questions as to what or who caused the crash, including, "Did Morrison get excited and grab the controls?" It observed that theories could doubtless be further multiplied as to how the accident occurred, but each would have as its basis only speculation and conjecture. "The evidence is as consistent with the theory of an unavoidable accident as it is with either theory of negligence as to either defendant, and in the absence of any available presumptions to aid the plaintiff the lower court was without error in entering judgment for the defendants."

See also, *Budgett* v. *Soo Sky Ways,* 64 S. D. 243, 266 N. W. 253; *Parker* v. *James E. Granger, Inc.,* 4 Cal. (2d) 668, 52 P. (2d) 226; and *Boulineaux* v. *Knoxville,* 20 Tenn. App. 404, 99 S. W. (2d) 557.

The conclusion stated makes it unnecessary to consider the defendant's assignment of cross-error to the action of the court in giving Instruction No. 1 for the plaintiff.

The judgment complained of is

*Affirmed.*