GERALDINE L. LIGHTENBURGER, INDIVIDUALLY, GREGORY DALE LIGHTENBURGER, A MINOR, DENISE SUE LIGHTENBURGER, A MINOR, MADYLON LESLIE LIGHTENBURGER, A MINOR, BY AND THROUGH THEIR GUARDIAN AD LITEM, GERALDINE L. LIGHTENBURGER, APPELLANTS, v. JOAN K. GORDON AND BANK OF NEVADA, CO–EXECUTORS OF THE ESTATE OF JAMES L. GORDON, A.K.A. J. L. GORDON, RESPONDENTS.

No. 4850

November 10, 1965                    407 P.2d 728

[Rehearing denied December 14, 1965]

*Morton Galane,* of Las Vegas, and *Robert F. List,* of Carson City, for Appellants.

*Singleton and DeLanoy* and *Rex A. Jemison;* and *Robert L. Gifford,* all of Las Vegas, for Respondents.

**OPINION**

By the Court, WINES, D. J.:

This is a wrongful death action brought by a widow for herself and on behalf of three minor children. The decedent, Dale D. Lightenburger, was killed when the Cessna 310 in which he was riding, crashed and burned at the Los Angeles International Airport on December 6, 1962.

The Complaint pleads alternative claims, namely; that Lightenburger was a passenger for a consideration within the purview of the California Guest Statute, and the proximate cause of his death was the negligence of James L. Gordon, pilot of the Cessna. In the alternative that Lightenburger was a guest and the proximate cause of his death was the willful misconduct of J. Gordon.

The Appellants, the widow and three children, appeal from a judgment on a verdict returned for the defendants in the trial court, James L. Gordon's executor and his surviving wife. The Appellants cite as error the giving of six instructions, the refusal to give an instruction offered by the Appellants, the exclusion of competent and relevant testimony, and permitting the jurors to have the instructions while deliberating.

We chronicle the events which brought the decedent to this pass, as we deem this necessary to an understanding of the errors assigned and our rulings.

James L. Gordon and Robert L. Bigelow were associated during the year 1962 in a business venture organized for the purpose of building, furnishing, and renting apartments in Las Vegas, Nevada. Gordon had a brother-in-law named Bervial C. Carrington, who was the owner and manager of the Carrington Carpet Company at Las Vegas, Nevada. Gordon had verbally

assured Carrington that if his merchandise was suitable and the price competitive Carrington Carpet Company would be favored in an award of a cost plus contract to furnish the apartments. In November of 1962 Carrington had employed Dale Lightenburger as the manager of his enterprise under his supervision.

Lightenburger's efforts to obtain that contract included having furniture sketches drafted for Gordon and Carrington had arranged to have Gordon and Bigelow visit the Los Angeles Furniture Mart to view and inspect furniture and furnishings. Carrington intended that he and Lightenburger accompany Gordon and Bigelow to the Mart on December 6, 1962. On December 5, 1962, using Carrington Carpet Company funds, reservations were made with a commercial airline and tickets purchased for a flight to Los Angeles on December the 6th. The cost of these tickets was charged by the bookkeeper to the general operating fund and not to the cost of this endeavor.

When, on December 6, 1962, Carrington and Lightenburger carried the sketches to Gordon's office, the meeting resulted in a change of plans. This change came after Gordon had been informed that Carrington and Lightenburger were flying by commercial airline to Los Angeles and a rendezvous in Los Angeles was being discussed. The commercial airline reservations were cancelled and Carrington and Lightenburger boarded Gordon's private aircraft to fly with Gordon and Bigelow to Los Angeles.

Gordon's aircraft was a Cessna 310–G. The airplane was owned by Gordon Supply Company, a corporation. The entire stock issue of the Corporation was owned by Gordon. It was a twin engine aircraft equipped for navigation by instruments, with an approach coupler and an automatic pilot. There was also a low frequency radio capable of receiving and transmitting. It had a retractable landing gear and had been inspected in November of 1962 and certified as airworthy.

None of the persons who went aboard that aircraft that afternoon was certified as an airman except J. Gordon. At the time of this flight Gordon had logged

668.07 hours of flying time as a pilot and of these hours 182.11 were on instrument flight. Gordon had been certified as an instrument pilot in 1962 and in the 60 days prior to this flight had logged some 90 hours on instruments.

After filing a flight plan with the Air Traffic Control in Las Vegas, Nevada, reporting 6 hours of fuel aboard and four persons, that his destination was the Los Angeles International Airport, Lockheed Burbank the alternate airport, J. Gordon took off at about 2:15 p.m. The flight to Los Angeles was uneventful and on schedule. The Cessna pilot at about 3:15 p.m., by radio, reported to the Los Angeles Control Tower that the Cessna's location was some 12 miles east of the Los Angeles International Airport. The Cessna pilot asked for clearance to land and the Cessna was cleared to land. "Cleared to Land" means the Tower has no known traffic to conflict with the landing. The Approach Controller then began giving instructions for the approach and in the course of these, as the weather was not favorable at the Los Angeles Airport, he suggested that the Cessna be guided to the Santa Monica Airport for a landing. The Cessna pilot agreed and in a few moments was off the Santa Monica Airport. When he called the Approach Controller at that airport on radio and asked for permission to land this was refused. The Controller reported that the airport was closed and gave the Cessna pilot the radio frequency of the Los Angeles Approach Controller. The word "closed" as used here means that the weather is below landing minimums.

The Los Angeles Approach Controller guided the Cessna pilot and in a few minutes he was again off the Los Angeles International Airport. The Cessna pilot asked for and received clearance to land. In the next few moments the Cessna pilot terminated the flight to the Los Angeles Airport and commenced an approach to Runway 25–Left at the Airport. An approach is a descent from flying altitude to a point over the threshold of the runway. At this point the pilot determines whether he has the minimums of vision vertically and horizontally which will permit landing.

It is pertinent to note here that when on approach the aircraft has reached that point over the runway at which the pilot must ascertain if he has the minimums of vision for landing, he does so visually. That is to say he must govern movement of the aircraft by what he perceives visually and not by the information given by the instruments on the ground or in the aircraft. A single pilot is at a disadvantage in executing such a maneuver. If he has a co-pilot he may rely on the co-pilot to fly the aircraft while he observes, or to observe as he flies.

The prudence of this approach is the critical issue of this action. Not because J. Gordon was inept in the execution of this maneuver and if he failed in his duty to those persons aboard the wrong was in his discount of the hazards created by the weather at the Airport. With one exception not material to the issue the components of and the equipment in the Cessna aircraft functioned efficiently throughout the approach. It appears too that the equipment at the Airport involved in guiding this maneuver was in good order and operated efficiently.

The Los Angeles International Airport is off the ocean at Los Angeles and its runways extend from east to west some 12,000 feet. The prevailing winds are off the ocean from the west and aircraft ordinarily take off and approach into the wind from east to west.

During the month of December the Airport is beset by ground fog from time to time. This occurs when on otherwise clear days, in the late afternoon, the cool moist winds off the ocean collide with the warm air rising from the runways and other airport areas. The water in the moist winds condenses into a dense fog. This fog hugs the ground and billows upwards to heights of between 100 and 300 feet.

At approximately 3:00 p.m. on December the 6th, 1962, the winds off the ocean, blowing at a recalled 5 knots from the southwest, began forming a ground fog on the Los Angeles Airport. The fog was observed and reported covering the Airport areas from the west to the east at a rate described as that of a "fast walk."

When the Cessna first arrived at the Airport at about 3:15 p.m. visibility horizontally from east to west along the 12,000 foot runways had been decreased by fog and smoke to 3,600 feet. The ceiling was not reported.

The weather at the Airport was reported to the Cessna pilot by the Controller at the Airport and we have the report of several bystanders. Since the observations of the bystanders was not reported to the Cessna pilot they are not particularly relevant. While the Cessna pilot was yet off the Airport on his return from Santa Monica he received a radio transmission to the effect that the runway visual range was then 1,400 feet. A pilot needs at the Los Angeles Airport 2,600 feet of runway visual range at 200 feet altitude in order to land. Runway visual range is the distance the pilot can see ahead or horizontally from a position over the threshold of the runway. The 200 feet altitude is also that altitude over the threshold of the runway.

The Cessna pilot, about 2 minutes later, asked for a radar approach, an approach during which the glide path is scanned continuously by radar at the airport and the pilot is constantly advised of his position relative to the glide path by the Controller by radio. At that time the pilot was advised that the runway visual range was 1,200 feet and asked if he still wanted the radar approach. He answered in the affirmative and was then informed that he was on course for Runway 25–Left and that runway visual range was 1,000 feet.

At about the same time the Approach Controller, who broadcasts on an assigned frequency and who may be speaking to several aircraft tuned to that frequency, advised an aircraft, here known as United 9203, that an aircraft ahead of the United had sighted the runway from a point one mile out and had gone over. The pilot of the United indicated that he was considering an approach and was advised that the runway visual range was now 1,000 feet. A minute or so later the United pilot broadcast to the Controller on this frequency that he would not attempt an approach unless he had a runway visual range of one-half mile when he initiated his approach. The Controller assured him that he would

not have that visual range and asked if the United wanted to move into a holding pattern. In a moment or so the United was in a holding pattern.

At 4:05 p.m., when the Cessna pilot was more than 7 miles east of the Airport and touchdown, the Controller advised that the approach would be terminated at a point one-half mile from touchdown. The word "terminate" when used in this context means that the approach, so far as the Controller was concerned, would be discontinued at that point and that the pilot would maneuver without his guidance.

When, at 4:05 p.m., the Cessna pilot initiated his approach at 8 miles out, he was again advised that the approach would be terminated one-half mile out from touchdown and that the runway visual range was then 1,000 feet. A moment later, while he was 6 miles out, the visual range had decreased to less than a thousand feet and the wind was from the southwest, and the Cessna was so advised. At 4:08 p.m. the Cessna pilot, then three and three-quarter miles from touchdown, was told that the ceiling, as perceived at the Airport by the instruments, was zero, indefinite, sky obscured, runway visual range less than 1,000. When the Cessna had reached a point 3 miles from touchdown the Cessna pilot was asked by the Controller, "Do you plan to make an approach in this weather?" And the answer was, "Put me down on the runway."

When the Cessna reached a point on the approach one-half mile from touchdown the pilot was advised that he was on course and he was to take over and complete the landing visually and that if he did not have visual range to land he was then to execute a missed-approach and report.

As this approach was terminated the radar used on the approach ceased observing the Cessna aircraft. The radar on the field, which scanned straight ahead over the runways and the surfaces of the airport, was snapped on; this radar system observes to a height of at least 200 feet and as it was snapped on it picked up the Cessna aircraft. The Cessna was observed on the screen to fly down the runway at an undetermined altitude but somewhere within a range of 100 to 200 feet

for a distance of 3,000 feet. At that point it went off the screen to the left. It banked to the left at a 70° angle and crashed some 500 feet south of the edge of the runway, headed in a northeasterly direction. It burned fiercely as a result of the fuel spill. Just prior to the crash the airplane was observed in this attitude—Nose down at 60° descent and its wings almost vertical. The motor sounded as if full power had been applied. The radar screen showed no obstacle encountered by the Cessna on its flight down the runway but it is not known whether or not the radar would pick up a flight of birds.

Four bodies were recovered from the burned aircraft, unidentifiable, except for unburned portions of clothing and cards. By this means the body found in the left front seat, which is usually occupied by the pilot, was identified as J. Gordon; the right front was occupied by Bigelow, and Lightenburger and Carrington were taken from the two rear seats.

A full investigation was made by qualified investigators of the Civil Aeronautics Board (CAB) of the facts surrounding the crash. The components of the aircraft not destroyed by the fire were examined carefully, the engines were pulled and torn down. There was no evidence of fire prior to the impact. One of the landing gears was in a down position with the flaps entended to a degree not remembered by the investigator. The throttles were in a forward, wide open position, the radio was on, the landing gear control lever was in a down position and finally the button activating the instrument known as the automatic pilot was off. An automatic pilot is an instrument which, when activated, will maintain the course and attitude the pilot selects for the flight of the aircraft. This leaves the pilot free to give his attention to other exigencies of the maneuver as, in this instance, attempting a visual contact. The button activating the automatic pilot is under the pilot's left thumb, on the wheel, and has no detent such as the button activating the landing gear, and may be turned off and on at will. An expert testified that in the crash the thumb may have unwittingly moved to turn off the

button activating the automatic pilot. A team of investigators examined the control surfaces, control cables, elevators, rudders, ailerons, fuselage, and an investigator observed that the elevator was attached to the empennage.

It is not known whether the aircraft was airworthy at all times prior to the crash. The opinion of the investigators who examined the several components of the aircraft and took notes as they did so was refused by the trial court as violative of the rule as to conclusions. The opinions, if permitted, would have related to the power plants and the propellers, the instruments in the aircraft, the control cables, the fuselage, the tail assembly and landing gear and would have been an opinion as to the airworthiness of the aircraft during the maneuver and prior to the crash.

Experts eminently qualified by hours and hours of flight, both by visual and instrument flight, testified to the issue and gave opinions on the better practice in situations such as was encountered by J. Gordon. As one would suspect, they disagreed. The Appellants' experts saying that good practice dictated going to the alternate airport, not commencing the approach, and if the approach was commenced it should have been abandoned. The Respondents' expert stated that good practice would countenance an approach as a standard procedure for a competent pilot.

The experts also disagreed on the subject of disorientation. Disorientation occurs when the pilot, unable to see and relate to the horizon because it is obscured by weather, loses his equilibrium and is no longer able to sense whether his aircraft is ascending, descending, or turning one way or the other. The Appellants' expert opined that the disorientation was a possibility. The Respondents' expert's opinion was that a valid opinion could not be formed. But it must be remembered that the experts' judgments were based on a different set of facts. The Appellants assume that between 100 and 200 feet altitude the Cessna was flying in fog and perhaps attempting a landing. The reply to this is that the nature and behavior of ground fog, having been

described by a qualified meteorologist, it does not rule out fog at 100 feet, more or less, and since no one observed the fog from the sky it is just as reasonable to assume that the Cessna flew above the ground fog.

Veteran pilots who had experienced panic by persons aboard told about their experiences but it does not appear that in any instance the person in panic did succeed in wresting the controls from the pilot. It was also established that this danger could be avoided by deactivating the controls on either the left or the right side of the aircraft. More to the point, no one proffered an opinion as to whether the persons aboard the aircraft would be aware of the hazards of the maneuver and the dangers of the situation or that they would be subject to disorientation.

It was learned from the evidence that wing tip vortexes are circular rotational velocity fields generated by wing tips of heavy fast moving aircraft. The vortex results from the lift created by the wing and it circulates on a horizontal axis. The velocity of the rotating air mass is sufficient to flip light planes on their backs and for the moment that aircraft is out of control. It is apparent that at low altitudes there is not space to recover. The speed of the aircraft encountering a vortex is an important factor. If the aircraft is moving at near stalling speed the peril is heightened. The period it takes to dissipate the velocities depends on the turbulence of the winds aloft and in still air the process of dissipation is slow. The occasion for considering vortexes arose from the missed approach executed by the large aircraft ahead of United 9203.

Here again there was disagreement by the experts on the time consumed in the dissipation of the velocities of a vortex. The time factor here between the flight of the large aircraft and the Cessna ranged from 23 to 7 minutes. There was testimony that except in infrequent instances the velocities dissipated to the point of being innocuous in 2 to 3 moments. And that light aircraft regularly followed heavy aircraft in taking off or approaching and landing at intervals of one minute at busy airports, and by direction of Traffic Controllers.

It was the opinion of the Respondents' expert that a vortex caused a violent roll of the Cessna and that the vortex resulted from the vortex trail of the Boeing 707, the United 9203. We note here that it was to this airplane that the Controller reported that an airplane had gone over.

Section 6047 of the Civil Air Regulations provides, "Within controlled airspace the pilot in command of the aircraft shall insure that continuous watch is maintained on the appropriate frequencies * * *." The Controller in this instance testified that the normal procedure is to transmit information to the first pilot coming in with the expectation that the information will be received by other aircraft without repetition. The Respondents' expert in airmanship stated a pilot normally hears only those transmissions concerned with him and another pilot stated that he did not ordinarily monitor the broadcasts. Neither were asked what would be good practice under the circumstances of this case.

The weather conditions at the alternate airport have been reported and it appears that at 15:55 (3:55 p.m.) surface visibility at that airport was 2 miles, at 16:55 (4:55 p.m.) it was still 2 miles, and at 17:32 (5:32 p.m.) it had improved and was then 3 miles. The United Flight 9203, after entering the holding pattern at the Los Angeles Airport, later departed for Burbank Lockheed Terminal and made a visual landing there at 4:36 p.m.

On approach an aircraft of this type reduces speed to approximately 90 miles per hour. On takeoff or a missed approach the speed is increased to 120 miles per hour.

When a pilot executes a missed approach he first applies takeoff power to increase speed, then moves the pressure on the engines forward; next the pilot trims his aircraft by initiating retraction of the landing gear and retracts the flaps thus reducing the air drag on the airplane. It takes a few seconds to increase power and manifold pressure and 12 to 15 seconds to trim the aircraft. These things accomplished he ascends on a prescribed course to a certain location and reports to the Control Tower the location of his aircraft.

We have written the facts, and perhaps to a tedious length, with this purpose in mind. We deem it necessary to point up the contentions of fact not with the idea of resolving these issues but to illustrate the error, if any, in instructing the jury on the law. We will, of course, confine our attention to the instructions objected to by the Appellants.

A cross-appeal was not filed but the Respondents contend that error could not have been committed as there was no issue of fact and a directed verdict was in order. We refer to the Respondents' argument that if it was folly to execute the approach there has been no showing that this act was the proximate cause of the crash. They support this contention by the observation that there was no evidence of disorientation prior to the crash and the Respondents argue that the Appellants postulate since they have not eliminated other causes of the crash. They insist that failure of a critical component of the aircraft prior to the crash, the possibility that the Cessna encountered a vortex, and that a person aboard panicked and grabbed the controls from the pilot account for the crash as convincingly as pilot error. Nor is it sophism, they say, to conclude that a directed verdict would have been proper in this action on this premise, the law will not permit a deduction that because an air crash occurred the crash was the product of pilot error and induced by a hazard of inclement weather, especially since the other causes have not been eliminated.

We think the Respondents argue their concept of the facts and if we consider it more reasonable, and we express no inclination, it would avail them nothing. It is for the jury to decide whether the Cessna moved over the runway in the fog or in the clear, whether disorientation manifests its effects by degrees or abruptly, the significance of the Cessna pilot's reply to the inquiry made by the Controller as to whether he would persist in his approach, and many other issues of fact. We here only determine whether the Appellants had a fair hearing on these issues.

1. It is out of order but we take up the first assignment of error, that to the admission of the evidence.

I think the trial court erred in excluding the testimony.

(1) It was opinion evidence and it touched on a material issue. It is apparent that Appellants offered this testimony to prove that there had not been, prior to the crash, a failure of a critical component of the aircraft. CAB investigators, who were asked to testify and give an opinion, were specifically trained and experienced to make observations of this nature and to reach conclusions. If permitted, and with the aid of notes taken while examining the remnants of the aircraft, the several investigators would have given an opinion that the component examined by them was capable of normal operations prior to the impact. These statements would have been made as to the aircraft's control systems, the components of the fuselage, the engines and the propellers.

Perhaps the more acceptable answer, if a proper question is put, is that in their examination of the remnants of the aircraft the investigators saw no evidence of operational stress or in the negative, that the damage they saw in every instance could be attributed to the impact or the fire. In any event the testimonies do not violate the hearsay or the opinion rule. The investigators were doing no more than reporting personal observations about the condition of the remnants of the aircraft. This requires an astuteness and experience and honest interpretation of what they observed. Time and again in this action experts were called upon to state opinions regarding good practice in flying, the nature and potential danger by vortex and possibilities of disorientation. It is manifest that the jurymen cannot depend upon their skills and experience in interpreting the data observed and reported to them by witnesses and if they are to reach conclusions they do so with the assistance of experts. It is important to note too that the conclusion was one of fact and not of law and this is another fact to be considered by the jury in determining the cause of the crash and if anyone was culpable.

The investigators had special skills in making interpretations upon data observed by them. The jury should have the benefit of their special skills and if their opinion testimony survived the test of cross examination the jury has evidence on which to reach a conclusion. It must be remembered that the jurymen finally decide the issue and their function is not usurped by the expert. Any aid in arriving at an intelligent decision should be admitted. See Lumberman's Mutual Casualty Co. v. Industrial Accident Commission, 29 Cal.2d 492–500, 175 P.2d 823 and 828; Wigmore on Evidence, 3d ed., Vol. 7, §§ 1919–1929, p. 14 et seq. We do not consider whether a statement of opinion violated the provisions of the Civil Aeronautics Act, 49 U.S.C.A. § 1441 (e) since the objection was not on that ground. But the testimony contained no opinions or conclusions as to the cause of the accident. Lobel v. American Airlines, 192 F.2d 217 (2d Cir. 1951), certiorari denied, 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703. Those portions of the reports which as a practical matter would tell the trier how the case should be decided should be excluded.

2. On the subject of decedent's status the trial court instructed the jury: "There are two factors which must be established before an occupant of an airplane can legally be considered to be a passenger rather than a guest; (1) That the pilot received tangible benefit from providing transportation for the occupant; (2) That a receipt of a tangible benefit motivated the act of providing transportation. A benefit which the pilot would receive whether he provided transportation or not does not legally constitute the necessary motivation for providing transportation."

The instruction was excepted to by the Appellants on two grounds. One, that it substitutes the test of actual receipt of benefits for the proper test under the California law which is the motivation test involving the state of mind of the pilot. And two, the motivation test may encompass the expectation of a future benefit and the instruction emphasizes the actual receipt.

The criticism is valid only if the Appellants submitted to the jury evidence proving a benefit following the furnishing of the transportation. It may unduly emphasize the idea of actual prior receipt of a benefit as a motive for furnishing transportation but it does properly state that if the benefit would have been received, whether transportation was furnished or not, then it cannot be the necessary motivation for providing the transportation. In California if a person provides transportation to another with the anticipation that a benefit to him will follow the person transported has the status of a passenger and is not a guest. Haney v. Takakura, 2 Cal.App.2d 1, 37 P.2d 170 (1934; 38 P.2d 160; Kruzie v. Sanders, 23 Cal.2d 237, 241, 143 P.2d 704 (1943); Gillespie v. Rawlings, 49 Cal.2d 359, 317 P.2d 601 (1957). This appeals as a sensible proposition and we see no justification in adopting a different rule in Nevada where in fact the transaction resulting in the furnishing of transportation occurred in this action. Nyberg v. Kirby, 65 Nev. 42, 188 P.2d 1006. The fault of the Appellants' assignment is that we cannot perceive a future benefit of value and cannot therefore find injury to the Appellants.

We concede the value of access to the Mart and to having the benefit of Lightenburger's experience and training in furnishings and furniture while on the tour of the Mart. But access to the Mart had been provided prior to the meeting in Gordon's office and Lightenburger had already committed his services to Gordon and would have been available in either event. For these reasons the case cited by the Apellants, Liberty Mutual Insurance Company v. Stitzle, 220 Ind. 180, 41 N.E.2d 133–136, is not apposite. In that case the purchaser furnished transportation anticipating she would have the benefit of the services of an interior decorator, and would not have had the services if she had not furnished transportation. The one benefit that may have been in J. Gordon's mind in offering transportation was the convenience afforded him by having Carrington and Lightenburger at hand upon his arrival at Los Angeles.

This is speculation and in the absence of proof it is reasonable to conclude that the transportation was offered as a courtesy. The invitation did come at the time they were discussing a time and place of meeting, and this proof suggests this possibility. If upon discussion of the meeting in Los Angeles problems were encountered, such as plane schedules, these facts were not obliterated with the death of the participants and the loss of memory of a bystander. But until some showing is made supporting the proposition that J. Gordon anticipated receiving a benefit of value to him the Appellants cannot complain that the instruction does not reflect their theory.

3. The Appellants excepted to Instruction No. 25. The instruction reads—"If you find that the regulations of the Federal Aviation Agency provided that a particular course of action was either permitted or prohibited under the circumstances and conditions of flight involved in this case, then such regulations are your guide in determining whether the fact that such maneuvers were performed was negligence or non-negligence." The exception was on the grounds that, "Compliance with the regulation is only a minimum standard of due care. The jury is still free under all the circumstances to render an independent determination of even whether compliance is negligence."

A number of Federal Aviation Agency regulations were given to the jury by way of instructions. From these we learn that the pilot in command of an aircraft, "Is directly responsible for its operation and shall have final authority as to the operation of the aircraft." In emergency situations requiring an immediate decision the pilot may deviate from the regulations to the extent required by consideration of safety. Also that no person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others. A number of definitions are included and finally this regulation, "That no aircraft, after reaching an altitude equal to the minimum altitude for landing specified in these regulations, will descend below such altitude unless it is clear of clouds and thereafter, except when

landing minimums equal to or higher than 1,000/2 are authorized, the aircraft will not descend more than 50 feet below such altitude unless, (1) It has arrived at a position from which a normal approach can be made to the runway of an intended landing, and, (2) Whether the approach threshold of such runway or the approach lights or other markings identifiable on such runway are clearly visible to the pilot. If at any time after descent below the clouds, the pilot cannot maintain visual reference to the ground or lights, he will immediately execute the appropriate missed-approach procedure prescribed in the regulations in this part." Instruction No. 52 reads as follows: "(A) A missed-approach procedure will be formulated for each procedure. A missed-approach would normally be made on a course which most nearly approximates a continuation of the final approach course, after due consideration of obstructions, terrain, and other factors influencing the safety of the operation. The missed-approach course, however, need not necessarily be a straight line. A missed-approach will be initiated at the point where the aircraft has descended to authorized landing minimums at a specified distance from the facility if visual contact is not established, or if a landing has not been accomplished or when directed by Air Traffic Control. The 'specified distance' may not be more than the distance from the facility to the airport * * *." We also note that elsewhere in the instructions (Instructions 12 and 56) the trial court instructed that the practice and usage of airmen could also be considered in determining whether the pilot exercised due care. In Instruction No. 12 this admonition was added, "Custom, usage and practice cannot change or overcome a statute or [a] regulation of the Federal Aviation Agency."

The Appellants augment their exception with these additional arguments. It is argued that the specificity of this instruction operates to invalidate the instruction defining negligence in general terms; that for the same reason it detracts from those instructions on practices and usages of airmen and implies that if the pilot's

conduct can be approved by this measure the other factors and circumstances properly considered in determining whether the pilot offended or obviated by this instruction. We think that the last argument comes within the terms of the exception taken by the Appellants and so we will consider it.

Assigning the regulations the rank of guide in determining whether the fact the maneuvers were performed, "was negligence or non-negligence," is an offense to the California law that compliance with an administrative safety regulation, though evidence for the jury to weigh in determining the issue of care, does not absolve the defendant from negligence. Bush v. Southern Pacific Company, 106 Cal.App. 101, 289 P. 109; Beeks v. Joseph Magnin Company, 14 Cal.Rptr. 877; Roberts v. Trans World Airline, 37 Cal.Rptr. 291. And saying by way of exception that there were other facts to be considered by the jury in deciding this issue and the jurors should be free to do so, is tantamount to saying that the instruction because of its language operates to direct a verdict except as to the issue encompassed in the instruction. When one compares the temperate and circumspect language of the other instructions, such as those on usages and practices of airmen, with the directive language of this instruction we must agree that the Appellants had cause for complaint. The jury could have been led to interpret Instruction No. 25 to mean that compliance with FAA Regulations is synonymous with due care, when in fact the issue is not the care exercised in performing but whether the pilot exercised due care in weighing the risks of the maneuver.

There is likelihood of confusion when a correct instruction is in general terms and an erroneous instruction in specific terms. Howard v. Worthington, 50 Cal. App. 556, 195 P. 709.

4. The Appellants took exception to given Instruction 40 on the ground that under the law of California

the definition of willful misconduct consists of two distinct elements—One is deliberate conduct in doing or omitting to perform an act with knowledge on the part of the culpable person that it is likely to result in serious injury. The second element is a wanton and reckless disregard of the possible consequences.

After telling the jury that if they found that Dale Lightenburger's status was that of a guest the trial court instructed that the Plaintiffs could recover only upon proof that the deceased pilot, J. Gordon, "Was guilty of willful misconduct which necessarily involved deliberate intentional conduct in doing or omitting to perform an act either with the knowledge on the part of the culpable person that it is likely to result in serious injury or wanton and reckless disregard of the probable consequences." The Appellants argue that the law of the State of California is applicable. Mitrovich v. Pavlovich, 61 Nev. 62, 114 P.2d 1084; Geller v. McCown, 64 Nev. 102, 177 P.2d 461. The Respondents did not answer to this proposition and we adopt the Appellants' view that the California law applies. The Appellants then trace the definition of willful misconduct in the California cases from an early statement in Van Fleet v. Heyler, 51 Cal.App.2d 719, 125 P.2d 586 (1942), through the last reported case, Reuther v. Viall, 42 Cal.Rptr. 456, 389 P.2d 792. These cases and the intervening cases, Cope v. Davison, 30 Cal.2d 193, 180 P.2d 873 (1947); Goncalves v. Los Banos Mining Co., 58 Cal.2d 916, 26 Cal.Rptr. 769, 376 P.2d 833 (1962); Meyer v. Blackman, 59 Cal.2d 668, 31 Cal.Rptr. 36, 381 P.2d 916 (1963); Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218 (1955); Carmean v. Bridges, 142 Cal.App.2d 99, 297 P.2d 671; Fuller v. Chambers, 142 Cal.App.2d 377, 298 P.2d 125, use the language "Wanton and reckless disregard of the possible results." The Respondents' answer to this is that it is a sophisticated play on words and void of logic. And apparently this too is their answer to the Appellants' contention that the error was material when the evidence is considered. It must be conceded that the instruction does not use the language

of the California cases, and I think the error material when we recall that the Appellants' expert airman stated that disorientation was a possibility when an approach was missed under such conditions by a pilot of J. Gordon's experience. He would not say that it was a probable consequence. Wanton reckless disregard could be found by the jury in these facts; as the pilot descended he did so with the knowledge that there was a steadily deteriorating visibility at the airport and that visibility was already below the Federal Aviation Agency minimums, that the Controller would terminate at a point one-half mile from touchdown thereby cutting off communications and guidance, that if he persisted in the approach he would be required to attempt a visual contact and expose himself to disorientation and when queried whether he intended making an approach in this weather he answered, "Put me right down on the runway."

The Court gave this instruction as Instruction No. 44 —"Whenever an airplane with dual controls crashes leaving no survivors a question arises as to which of the two persons with equal access to the flight controls was actually controlling the aircraft at the time of the crash.

"If you find from the evidence that the aircraft was under the control of some person during the final flight maneuver which resulted in the crash and that the final flight maneuver, even though negligently performed, was consistent with the intended flight pattern of the pilot then you may infer that the one most likely to be flying was the person piloting the aircraft at the time of the accident.

"If, however, you find the final flight maneuver was a radical maneuver and was not consistent with the intended flight pattern of the pilot then you may not make an inference that the airplane was under the control of a particular person at the time of the accident."

The Court also gave Instruction No. 61 which inserts the following paragraph between the second and the last paragraph but is otherwise identical with Instruction No. 44. "In making this determination, you may

take into consideration all the factors bearing on the question, including the ownership of the airplane, the possession of a license by James L. Gordon, the non-licensure of the other occupants of the aircraft, the identity of the pilot in command of the flight, the post crash position of the bodies and the custom, if any, of customary seating of the pilot operating the plane."

This instruction was formulated and offered by the Respondents' counsel after the study of these cases. Morrison v. LeTourneau Company of Georgia, (5 Cir. 1943), 138 F.2d 339; Towle v. Phillips, 180 Tenn. 121, 172 S.W.2d 806; Hall v. Payne, 189 Va. 140, 52 S.E.2d 76.

In the case of Morrison v. LeTourneau Co., supra, the aircraft was observed shooting straight up 200 feet and at that point a wing was torn off. In Towle v. Phillips, supra, after what appeared to be a normal takeoff the airplane made a vertical climb at low altitude, then stalled, dropped and fell to the ground. In Hall v. Payne, supra, the plane was observed circling over rough terrain and gradually losing altitude and then was observed falling to the ground where it crashed and burned. Apparently in the later stages of this maneuver the aircraft lost power since the witnesses reported they heard the engine sputtering, then the engine was "cut off" and then the aircraft made a "whistling" sound and the witness could not hear the engine.

In the first two cases the court refused to apply the doctrine of res ipsa loquitur. The doctrine was discussed but not applied as the court found that there are a number of causes for airplane crashes and not all of these are necessarily related to pilot error. Among the conjectures were engine failure, operational stress, failure of control systems, and seizures by an occupant who had panicked. In each case the court ruled that proof that the aircraft appeared to be out of control did not establish negligence on the part of the pilot.

Whatever the background for this instruction we agree with the Appellants that Respondents' evidence

is emphasized unduly by the instruction. The Respondents submitted evidence showing that passengers in aircraft sometimes when placed in fearful situations panic and seek relief in grabbing the controls. There was no evidence that this happened in this instance.

From this the Respondents derived that if an aircraft crashes and there are aboard two persons to whom the controls are equally accessible a question arises as to who was in control at the time of the crash. If this is true as a matter of law then on what is it based? We very much doubt that Respondents' evidence is sufficient to show a propensity of men nor is it proper to say that because the crash occurred we should suspect interference.

As long as the flight is within the bounds of normal flight, and we think that the phrasing should have been normal flight patterns instead of intended flight patterns, it is to be inferred that the airman is in control. But if the final flight maneuver is radical which, of course, puts it without the bounds of normal flight, the inference cannot be made. Again we ask, what propensity of man or characteristic of air flight do we ascribe this inference? It is true that a novice would have to be uncommonly gifted to perform normal flight patterns under these conditions. But this instruction implies that competent airmen are rarely capable of radical maneuvers and that we should search elsewhere for the cause of the crash.

The Appellants say that the instruction does not properly present the issue and that it is tendentious comment on the evidence. With this we must agree. When, from all the facts bearing on the issue of the identity of the persons at the controls at the time of the crash, certain facts are singled out and connoted for the jury the other facts bearing upon this issue lose significance. Suppose the trial court had said to the jury that normally competent airmen do not perform radical maneuvers, that learning to fly competently is the discipline of avoiding radical maneuvers and when a radical maneuver occurs in flight a question of the competency of the airman arises. We are aware that it would not

have been judicial but it serves to point up that unless a fact bearing on an issue has a special significance found in the propensities of men or in the laws of nature the trial court should submit the issue by way of a general instruction. The most that Appellants should suffer is that if the jury, after considering all the facts bearing on this issue, remain unconvinced as to the identity of the person at the controls, the party submitting the evidence has failed to carry the burden of his proof. We are not even permitted in this State as judges to think for the jury in a judicious manner and say what facts the court considers pertinent to the issue. We see no merit in the proposition that because the final maneuver is radical the pilot is any less suspect, especially when the evidence submitted by the Appellants is directed towards showing that the maneuver was due to a disorder of the senses.

We have already said that the error of a specific instruction is not erased by a more acceptable general instruction.

The trial court refused to give Proposed Instruction "A" offered by Appellants which reads as follows:

"It is the duty of a pilot not to operate an aircraft in a careless or reckless manner so as to endanger the life of others. This duty is not necessarily fulfilled by complying with those regulations issued by the Federal Aviation Agency. Such regulations prescribe only the minimum measure of care that would satisfy the Federal Aviation Agency and the law. Whether or not compliance with such regulations, if there was such compliance, amounted to reasonable care is a question that the jury must decide according to the following principle, namely, any measures that would have been taken by a reasonably prudent pilot to protect the occupants of the aircraft in question and at the time in question from a particular danger, if there was such danger, in view of the particular circumstances at the specific time, with the measures required of the pilot. Compliance with the regulations of the Federal Aviation Agency does not relieve a pilot from exercising ordinary care in the operation of the aircraft. If a reasonably prudent

pilot would have abandoned the approach under the particular circumstance the pilot was guilty of negligence. If the pilot complied with the regulations of the Federal Aviation Agency after reaching altitude for landing specified in the regulations, the pilot still had the duty to exercise the care of a reasonably prudent pilot in the circumstances of operating the aircraft."

The reasons given for refusing the instruction have not been endorsed on the offered instruction nor do they otherwise appear in the record.

The Federal Aviation Agency, by its Regulations, prescribe the manner of performing flight maneuvers. These Regulations are designed to promote safe conduct of air traffic. However, none of the Regulations, or none that we have seen, impinge upon the pilot's discretion in determining whether a maneuver shall be attempted, persisted in, or abandoned. The pilot's final authority in the operation of the aircraft is recognized in Section 60.2 of the Regulations. At the same time those persons controlling air traffic are at great pains to fully inform the pilot so that he may act prudently in making his decisions. The experts agree that the maneuver here considered was competently performed. They did not agree that it was in accord with good practice and usage to execute the maneuver under the circumstances shown by the evidence. It was recognition of this issue that the Appellants sought on this proposed instruction.

We have already held it was error to instruct that the decision on the issue should depend on whether a particular maneuver was permitted or prohibited by the Regulations under the circumstances and conditions of this flight. The issue is whether the pilot used due care in appraising, or went so far as to flout the dangers inherent in the weather conditions reported from the Airport. Final authority entails like responsibility. We relate the Regulations on maneuvers to standards for performance but not to the advisability of undertaking, persisting or in abandoning a maneuver. If the pilot's sole skill was the competent performance of a maneuver flying would no longer be an art.

The instruction proposed by the Appellants does not reach the issue as we conceive it. It also assumes that the decision of the pilot as to the operation of his aircraft is governed by the Regulations and asks that a higher standard of care than compliance with the Regulations be imposed. The usage and practices of competent airmen was an issue of fact in this action. What other issue than to the prudence of the pilot in exercising his final authority renders such evidence competent and admissible? We are unaware of any Regulation specifying when a pilot should resort to an alternate airport or when he should approach. The standard of care required in the exercise of this authority is not found in the Regulations and competent performance does not necessarily assure safety. His skill in performing a maneuver may influence a pilot in determining whether he shall attempt it but other factors must be considered too. The pilot carries the same burden of care as any other person engaged in the practice of an art.

Even if we were to accept the instruction proposed as a fair statement of the law on an issue we would not accept it in the form it is now written. It has the fault of repetition but we reject it as an improper framing of the issue.

The Appellants assign as error the trial court's rule permitting the jury to have the instructions during its deliberations. We deem it a procedural matter that has for some time now been permitted by the Nevada Rules of Civil Procedure. NRCP 51; Beale on Conflict of Laws, Vol. 3, § 548.1, et seq., at 1599.

We have not agreed in every instance on the merit of the Appellants' protests. If our views are dissident in that aspect, they are not on the necessity for a new trial. I think the failure of the trial court to properly instruct or rule on evidence on any single major issue, such as identity of the person at the controls at the time of the crash, or the airworthiness of the aircraft prior to the crash, would be sufficient cause to order a

reversal. The cumulative effect impresses my colleagues. Garner v. State, 78 Nev. 366, 374 P.2d 525 (1962). And so having had our say, we reverse and remand for a new trial.

THOMPSON, J., with whom BADT, J., joins, concurring:

We agree with Judge Wines that the judgment below must be reversed and another trial ordered, but we do not wholly agree with his reasoning and treatment of some of the assigned errors. Hence, this concurring opinion.

To place the appeal in focus, some preliminary comments are in order. First, the main dispute on appeal is over certain of the jury instructions given regarding the alternative theories of liability under California law. One theory claimed that Lightenburger was a passenger for consideration, and was killed by the negligence of the pilot James Gordon. The other alleged Lightenburger's status to be that of a guest, and sought to impose liability because of the willful misconduct of Gordon. As a general verdict was returned, we do not know the reason for the jury result. Recovery may have been denied because the jury believed that Lightenburger was a passenger, and pilot negligence was not shown; or because they found Lightenburger to be a guest and the pilot's willful misconduct was not established; or because the pilot's conduct, however characterized, did not proximately cause the crash. A request was not made that the general verdict of the jury be accompanied by answers to interrogatories, NRCP 49(b). In these circumstances, substantial error in the charge of the court as to either of the alternative theories of liability would require a remand for another trial. Sunkist Growers v. Winckler & Smith Co., 370 U.S. 19.

Second, the appellants do not assert that the evidence will not support the verdict reached by the jury. The issues regarding status and liability were treated below, and here, as fact issues which the jury could decide either way without fear of reversal by a reviewing

court. The crash occurred in California, and the substantive law of that state was deemed controlling by the litigants. The trial proceeded with California law in mind. Mitrovich v. Pavlovich, 61 Nev. 62, 114 P.2d 1084 (1941); Campbell v. Baskin, 69 Nev. 108, 242 P.2d 290 (1952). Thus, we are not presented a choice of law problem. Cf. Kilberg v. Northeast Airlines, 9 N.Y.2d 34, 172 N.E.2d 526 (1961); Pearson v. Northeast Airlines, 2 Cir., 307 F.2d 131 (1962).

1. The jury instructions of which the appellants complain seem to us to favor the defense to such an extent as to throw doubt upon the reliability of the verdict reached. For example, the instruction dealing with Lightenburger's status (passenger or guest) is cast in words that tend to preclude anticipated future benefit as an effective status-changing factor, and also includes a sentence which comes close to advising the jury that Lightenburger was a guest as a matter of law. The instruction about willful misconduct speaks in terms of "probable consequences" rather than "possible consequences," though California law is quite clear as to this aspect of the instruction. The words used to advise the jury that applicable F.A.A. regulations "are your guide" in deciding negligence, unduly emphasize the significance of those rules and almost preclude the jury from finding negligence if it found that the regulations had been complied with. The instruction regarding an aircraft with dual controls should not have been given at all, and the last sentence of that instruction tells the jurors, in effect, that if they find the final flight maneuver to have been a radical maneuver, the aircraft was not under Gordon's control. These instructions concerned the main issues in the case. Exception was duly taken to each of them. The case was not a one-sided affair, and called for special care in advising the jury on the law.

(A) The challenged instruction regarding status was, "There are two factors which must be established before an occupant of an airplane can legally be considered to be a passenger rather than a guest; (1) That the pilot received a tangible benefit from providing transportation for the occupant; (2) That a receipt of a tangible

benefit motivated the act of providing transportation. A benefit which the pilot would receive, whether he provided transportation or not, does not legally constitute the necessary motivation for providing transportation." Judge Wines has pointed out in his opinion that Carrington and Lightenburger had purchased tickets to fly by commercial airline to Los Angeles, intending to meet Gordon and Bigelow there. A change of plans apparently resulted. The commercial flight was canceled, and Carrington and Lightenburger boarded Gordon's private aircraft to fly with Gordon and Bigelow to Los Angeles. The last sentence of the instruction is directed to this bit of evidence and almost tells the jury that Lightenburger was a guest because he would have been present in Los Angeles to assist Gordon in any event. It is true that the words used do not absolutely preclude a finding that Lightenburger was a passenger. They are, however, slanted in that direction. We think the observation of the California court in Thompson v. Lacey, 42 Cal.2d 443, 267 P.2d 1 (1954) significant. There several employees of a company, in the course of employment, rode together to their company's meeting. The court held the fact that the company was reimbursing the driver for mileage was significant to show the driver was being compensated for the trip even though "he would have received the same amount whether or not he carried other employees with him."

Pertinent California authority about "benefit" is reviewed in Gillespie v. Rawlings, 49 Cal.2d 359, 317 P.2d 601 (1957). The court simply concludes that the central thought running through the cases is that a "tangible benefit, not mere pleasure, kindness or friendship alone, must be the principal inducement for the ride to constitute compensation." In the case at bar, the jury could have found that the principal inducement for the ride was to further the business considerations of Gordon. Lightenburger, as manager of Carrington Carpet, was Gordon's prospective supplier of furnishings. On the other hand, the jury could permissibly have concluded that Gordon did not receive any tangible benefit by providing transportation for Lightenburger in addition to Carrington. The issue was one of fact, which

could have been decided either way. Whittemore v. Lockheed Aircraft Corp., 51 Cal.App.2d 605, 125 P.2d 531 (1942); Halbert v. Berlinger, 127 Cal.App.2d 6, 273 P.2d 274 (1954). Resolution of that issue should not have been blurred by an instruction which, by clear implication, directed the jury's attention to an inconsequential bit of evidence. We do not agree with Judge Wines that the claimants' showing was insufficient to support the proposition that Gordon anticipated receiving a benefit of value to him.

(B) The California legislature has enacted a "guest law" applicable to aircraft accidents. Cal. Pub. Util. Code § 21406. This statute is interpreted similarly to California's automobile "guest law." Halbert v. Berlinger, supra. One who rides in an aircraft as a guest has no right of action against the pilot unless he can show intoxication or willful misconduct. The appellants assert that the court erred by instructing the jury that "willful misconduct" involves a "wanton and reckless disregard of probable consequences," arguing that California law speaks of "possible consequences." California prefers a bifurcated definition of willful misconduct: conduct either with knowledge that serious *injury* to the guest *probably* will result, or with a wanton and reckless disregard of *possible consequences*. Gillespie v. Rawlings, 49 Cal.2d 359, 317 P.2d 601 (1957), where California case law is reviewed. Here again the mistake inured to the benefit of the defense.

(C) Safety regulations of the F.A.A. are regarded by most courts as authoritative and impartial criteria for judging the conduct of persons covered by those regulations. Roberts v. Trans-World Air Lines, 225 Cal.App. 2d 344, 37 Cal.Rptr. 291 (1964); Moody v. McDaniel, N.D.Miss., 190 F.Supp. 24 (1960); Citrola v. Eastern Air Lines, 264 F.2d 815 (2d Cir. 1959); Pappas v. Pieper, 325 S.W.2d 789, 75 A.L.R.2d 850 (Mo. 1959); Lange v. Nelson-Ryan Flight Service, Inc., 259 Minn. 460, 108 N.W.2d 428 (1961); United States v. Miller, 303 F.2d 703, (9th Cir. 1962). With this in mind the following instruction was given, "If you find that the regulations

of the Federal Aviation Agency provided that a particular course of action was either permitted or prohibited under the circumstances and conditions of flight involved in this case, then such regulations are your guide in determining whether the fact that such maneuvers were performed was negligence or non-negligence." Pertinent F.A.A. regulations were then given as separate instructions. Stock instructions about negligence were also given.

It is settled law in California that compliance with administrative regulation is evidence for the fact finder and does not alone absolve a defendant from liability. Compliance is a fact which the jury may weigh in deciding the issue of due care. Roberts v. Trans-World Air Lines, supra. Because of this California prefers that the jury be advised that a defendant is not necessarily free from negligence even though he may have complied with safety rules. Dragash v. Western Pacific Ry. Co., 161 Cal.App. 2d 233, 326 P.2d 649 (1958). The circumstances of a particular accident may require more of a pilot than compliance with applicable regulations. The jury was not so advised in the instant case. Absent such advice, the quoted instruction appears to contravene California law. We note again that the error favored the defense.

(D) Small aircraft are generally equipped with dual controls. It is possible to control the aircraft either from the standard pilot's seat on the left-hand side, or from the seat on the right. Gordon's Cessna was so equipped. When such an aircraft crashes, killing all occupants, it is sometimes impossible to know whether the plane was being controlled from the left-hand seat or the right-hand seat.

Here there was evidence from which the jury could believe that the final flight maneuver before the crash was a radical maneuver and not consistent with the intended flight pattern of the pilot. The court was persuaded by the defense to give the following instruction, "Whenever an airplane with dual controls crashes leaving no survivors a question arises as to which of the

two persons with equal access to the flight controls was actually controlling the aircraft at the time of the crash.

"If you find from the evidence that the aircraft was under the control of some person during the final flight maneuver which resulted in the crash and that the final flight maneuver, even though negligently performed, was consistent with the intended flight pattern of the pilot then you may infer that the one most likely to be flying was the person piloting the aircraft at the time of the accident.

"If, however, you find the final flight maneuver was a radical maneuver and was not consistent with the intended flight pattern of the pilot then you may not make any inference that the airplane was under the control of a particular person at the time of the accident."

In our view the instruction was improper in the context of this case. None of the cases discussing dual controls involves the propriety of instructing the jury on the point. It is true that some of the earlier opinions employed language similar to that used in the quoted instruction. Budgett v. Soo Sky Ways, Inc., 64 S.D. 243, 266 N.W. 253 (1936); In re Estate of Hayden, 174 Kan. 140, 254 P.2d 813 (1953); Morrison v. Le Tourneau, 138 F.2d 339 (5th Cir. 1943); Towle v. Phillips, 180 Tenn. 121, 172 S.W.2d 806 (1943); Hall v. Payne, 189 Va. 140, 52 S.E.2d 76 (1949). The discussion, however, usually is referable to the non-applicability of the doctrine of res ipsa loquitur to an aircraft crash case. The fact of dual controls is fastened upon to destroy the exclusive control requirement of res ipsa. Here the claimants did not rely upon res ipsa loquitur in pressing their charge of negligence. Furthermore, recent decisions disapprove strict adherence to the exclusive control element of res ipsa in an aircraft case. The defendant is required to come forward with some showing that another party may have been controlling the aircraft at the time of the crash. Boise Payette Lumber Co. v. Larsen, 214 F.2d 373, 46 A.L.R.2d 1038 (1954); Schumacher v. Swartz, Pa. Com. Pleas, C.C.H. 2 Avi. 18,006 (1948); Drahmann's Administratrix v. Brink's Administratrix, 290

S.W.2d 449 (Ky. 1956). All three of these cases permitted jury consideration of control, and appear to remove the res ipsa blockage. See also note, 11 Univ. of Fla.L.Rev. 351. The cases appear to ignore the significance of any "radical maneuver" just before the crash. The original pilot continues in command, unless proven otherwise, and a so-called "radical maneuver" is immaterial in ascertaining pilot identity. The need for this point of view is exemplified by the evidence in this case. Gordon was the only occupant of the airplane licensed to fly. He was the pilot at takeoff. His voice was identified as the voice in communication with the Controller at the Los Angeles Airport. Four bodies were recovered from the burned aircraft, unidentifiable except for unburned portions of clothing and cards which placed Gordon in the left front seat—the seat usually occupied by the pilot. In these circumstances, a jury instruction directing the jurors that they "may not make any inference that the airplane was under the control of a particular person at the time of the accident" if the final flight maneuver was a radical maneuver, is manifestly wrong and defies common sense.

The instruction possesses another vice—that of focusing the jury's attention upon pilot identity just before the crash and when the so-called "radical maneuver" occurred. The claimants contended throughout that pilot negligence preceded this event and lay mainly in the failure of Gordon to properly evaluate the hazards created by the weather at the airport. We regard the dual control instruction as plain error.

2. As this case must be remanded for another trial, we mention one further point concerning which we do not agree with Judge Wines. The appellants claim that it was prejudicial error for the trial court to reject a C.A.B. accident report stating there was no evidence of any equipment malfunction before the crash. We think that the trial court ruled correctly. Objection was timely made and upon the proper ground—that this particular part of the report was the opinion of the investigator.

Federal law prohibits investigators of the C.A.B. from

expressing expert opinions in civil litigation. Civil Aeronautics Act, 49 U.S.C. §§ 1301–1542 (Supp. 1962), specifically § 1441(e). It reads, "No part of any report or reports of the Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

As noted in Berguido v. Eastern Air Lines, 317 F.2d 628, (3d Cir. 1963), judicial interpretation of § 1441(e) has not been too extensive or precise. The court there wrote, "The fundamental policy underlying 1441(e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank discussion as to the probable cause and thus help prevent future accidents and the countervailing policy of making available all accident information to litigants in a civil suit. Accordingly, the primary thrust of the provision is to exclude C.A.B. reports which express agency views as to the probable cause of the accident. Of necessity, the opinion testimony of the C.A.B.'s investigators would also come within this rule." Here the portion of the C.A.B. report to which objection was made is the statement of the investigator that there was no evidence of equipment malfunction. We think that the statement is more nearly an opinion than a statement of fact, and barred by the act. Fidelity & Casualty Co. of New York v. Frank, 227 F.Supp. 948 (1964). In Fidelity a similar problem was presented. The court excluded the evidence, stating, "A more workable and better rule is entirely to exclude all evaluation, opinion and conclusion evidence. This is the only practical way to give adequate effect to and fulfill the purpose of the provisions of Sec. 1441(e)." See also Israel v. United States, 247 F.2d 426 (2d Cir. 1957).