[Civ. No. 10520. Third Dist. Oct. 7, 1963.]

ROBERT DWIGHT CLAWSON, a Minor, etc., Plaintiff and Respondent, v. STOCKTON GOLF AND COUNTRY CLUB, Defendant and Appellant.

Charles A. Zeller for Defendant and Appellant.

Jack Miller, Harvey M. Hakeem and Maxwell Freeman for Plaintiff and Respondent.

JANES, J. pro tem.*—Plaintiff minor brought this action against the Stockton Golf and Country Club and Craig Moore, one of its members, to recover damages for personal injuries suffered when he was struck, while searching for golf balls on the club's golf course, by a ball driven by defendant Moore. The jury returned a verdict in favor of the golfer against plaintiff and in favor of plaintiff against the club. Defendant club appeals from the ensuing judgment.

Defendant's principal contention on appeal is that the trial court committed prejudicial error by instructing the jury that plaintiff was a business visitor or invitee of defendant if plaintiff were on defendant's property, at the time of the accident, for the purpose of finding golf balls and then selling the balls to the golf professional at defendant's caddy house.

An invitee or business visitor is generally defined as a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them. (Rest., Torts, § 332.) The two ultimate facts establishing the invitee status are thus *invitation* and *business purpose*. Plaintiff concedes that the questioned instruction, which is hereinafter set out in full, omitted the invitation aspect of the status. He contends, however, that the omission was not erroneous because the invitation was established as a matter of law by undisputed evidence. The question before us, therefore, is to determine whether there was any evidence of sufficient substantiality which required submitting to the jury, as a factual issue, the question of the invitation aspect of plaintiff's status on defendant's property at the time and place of

---

*Assigned by Chairman of Judicial Council.

injury. In deciding that question the evidence, with the inferences therefrom, must be viewed in the light most favorable to the defendant. (*Howard* v. *Alta Chevrolet Co.*, 111 Cal.App.2d 38, 42 [243 P.2d 804].) With these rules in mind, we turn to the evidence.

The defendant Stockton Golf and Country Club (hereinafter "club") had for many years prior to the accident operated a country club and golf course in West Stockton. The club, a California corporation, was operated by a board of directors, whose policies and orders were executed by its president and other officers through employees of the club, among them its golf professional and his assistant, and a foreman in charge of grounds maintenance. The golf professional was charged with overall supervision of the golf course. Built in 1915, in an area then rural, the club and golf course by 1958 had become surrounded on several sides by residential subdivisions. Beginning in 1946 the population of the area had increased greatly, until at the time of the accident, on May 31, 1958, the area was well populated. The club's golf course, the only one in the area, was an 18-hole course, approximately 130 acres in size and rectangular in shape. A paved two-lane road ran through the center of it from the main entrance on the east to the club house on the west, of which the "caddy house" or "pro shop" was a part. The club property was for the most part unfenced, except for a strip of 6-foot "cyclone" fencing along the southwest boundary where the property bordered upon the Stockton Deep Water Channel, and certain private fences erected by adjoining property owners. There was also a fence along the east boundary of the property, where the present accident occurred. The area of the main entrance on the east of the property was neither fenced nor barricaded; the boundary there was delineated by a line of narrow posts placed sufficiently close together to prevent the passage of automobiles. The main entrance and other points of access to the property were open ways, without gates that could be closed or locked, and without chains or other barriers.

The sixth hole and fairway of the golf course lay in a general north-south direction, the tee or starting point being to the north and the play proceeding to the green on the south. Along the east edge of this fairway was a row of large trees, and to the east or outside of the trees was a wire fence which marked the boundary of the golf course. The fence was erected as a three-strand fence, to a height of 3 or 3½ feet, and extended for a distance of approximately 500 yards

along the east boundary and across part of the north boundary of the course. The accident in which plaintiff suffered his injury occurred in the row of trees, some 200 yards south of the sixth tee and a foot or two west of the east boundary fence.

Near the place of accident was an "arch" or opening in the wire fence, ungated, which was placed there so golfers could leave and return to the course in order to retrieve balls driven over the fence and out of bounds. Near the arch stood a "Private Property—No Trespassing" sign. A well-defined path lead through the arch from the course proper to the out-of-bounds area. Outside the fence at this point was an open culvert or ditch, running parallel to the fence line and row of trees and separating the golf course from Rainier Avenue, a public way also extending in a north-south direction.

Plaintiff produced evidence which showed that for many years, but particularly since 1946, the club had been troubled by the presence of young boys on the golf course, to an extent that prior to the time of plaintiff's injury their presence had been discussed at several meetings of its board of directors. The problem increased over the years with the increase in population. It was in an attempt to cope with this situation that the club had erected the fence along the east boundary. Balls driven from the sixth tee sometimes "hooked" or curved sharply to the left into the area of the row of trees, with the result that the row of trees was a good place for boys to look for lost golf balls; they were often seen there searching for balls. The grass around the trees was longer than that on the rest of the fairway because the trees prevented a close mowing of the grass; outside the fence, in the area of the ditch, the grass was even longer. In addition to the wire fence, signs lettered "Private Property—No Trespassing" were erected, about a year before the accident, near the place of accident and at other points on the boundaries of the property.

It was further shown by plaintiff that the directors of the club, in addition to erecting the fence and signs, had adopted a policy of encouraging club members to "run off" the boys when they were seen on the golf course. No written admonitions to this effect were placed in the club's bulletin, in its written rules and regulations or on its bulletin board; the policy of discouraging and expelling the boys from the course was communicated to the membership only verbally. There were about 400 members of the club, although the evi-

dence suggests that not all of them were playing members. No attempt was made to convey the admonition to guests or visiting golfers who used the course.

It was shown by plaintiff and admitted by the club that for more than 30 years the golf professional and his assistant, with knowledge of the club officers and its directors, had bought golf balls retrieved by the boys and delivered by them to the caddy house in the west of the property. This was a matter of common knowledge around the club. No policy was adopted forbidding purchase of the balls nor had anyone ever ordered the boys out of the caddy house when they went there to sell the golf balls which they had found. The golf professional bought about 12 balls a week from the boys and his assistant bought about twice that number. The boys were paid five or ten cents for each ball, depending upon its condition. Those of the better balls which bore name imprints were returned to their owners for the same price paid to the boys; those which could not be identified were sold to members of the club for thirty-five cents a ball. The remaining balls were used on the club's driving range.

Plaintiff showed that boys were sometimes seen on the course itself selling balls to players. When this was observed the boys were run off the course by the caddies; they often returned, however, as soon as the caddies turned their backs. Club members were never directed not to buy balls from boys who came onto the course itself.

For the purpose of selling balls at the caddy house, the boys walked up the main drive through the center of the course; they did not cross the fairway or playing area. The golf professional, when purchasing balls from the boys, occasionally inquired as to where the balls had been found. The assistant professional never asked this question of the boys. Both professionals, however, warned the boys to stay off the golf course itself.

Plaintiff showed, as we have seen, that the boys returned to the course almost as rapidly as they were expelled; further, that they ignored the "no trespassing" signs, continuing to come onto the course after the signs were erected. It was shown that the wire fence was no more effective; its construction was such that children could go over, through and under it. Adults, too, were known to go through and over the fence on many occasions in order to retrieve errant golf balls. The fence was three-strand in places and two-strand in others; partly barbed and partly plain wire. Strands of wire occasion-

ally broke and portions of the fence were down for periods of time. Boys passed freely through the arches, gates and other openings despite the "no trespassing" signs. Children could enter the main gate on the east, also, and pass to the west or inside of the fence, up the eastern side of the golf course. The course was never patrolled or policed for the presence of children.

Two former presidents of the club testified that its board of directors, both before and after plaintiff's accident, had considered erecting a large steel fence along the east boundary in the area of the accident, but that the club decided it was not feasible to erect such a fence because of the row of large trees in that area; that it would serve no purpose in any event in view of the other points of unlimited access to the course; and that even a fence 15 or 20 feet high would not keep golf balls inside the course or children outside. The subject of patrolling the course was also discussed but did not receive serious consideration for similar reasons, and because of the size of the course. There was testimony on the club's behalf that the fence on the east boundary was three-strand and of barbed wire; that it was possible for boys to get through the fence, but only with some difficulty; that although strands did break occasionally, usually when hit by vehicles, they were usually repaired within a day or two; that at the time and place of plaintiff's injury the fence contained three strands of wire instead of a single strand as plaintiff testified. There was testimony that golf balls were usually lost outside the boundaries of the course and retrieved by the boys in the out-of-bounds area, where the grass was not mowed, because there was little chance of losing balls on the course itself where the grass was cut almost like a lawn throughout; that there were usually several players watching the ball, particularly when the play was foursome, and that they seldom lost a ball on the fairways. Several defense witnesses testified that the grass was fairly short and clear inside the fence in the tree area where plaintiff was injured. The photographs in evidence show that the grass there, in its height and thickness, contrasted more sharply with the grass outside the fence than that within. There was testimony by several defense witnesses that boys were seen on the course "rarely" and "occasionally," and in the area of the trees "rarely." A golfer who played the course regularly on Saturdays and Sundays and occasionally on week days testified that boys were seen on the course itself only on extremely

rare occasions when play was in progress. The general practice of the golfers, club officers and employees was to direct the boys off the course whenever they were observed there, although they frequently returned. Plaintiff was himself warned to leave the course by golfer Moore, immediately before the accident, and he had earlier been warned by his mother to stay off the fairways; one of his school teachers, who feared that the boy might be injured there, had also given him such a warning. The golf professional charged with overall supervision of the course testified that he never encouraged or knowingly permitted boys to come onto the course.

There was evidence that it is not customary for golf courses to have locked gates or watchmen at the entrances. A former president of the club (in 1959) and member of its board of directors (1957-1959)—a much-traveled golfer—testified that he had visited many golf courses in both Northern and Southern California, and in Canada, and that courses comparably situated were generally unfenced. He knew of only one golf course in California that was completely fenced, and in that instance the course had an open gate entrance with no watchman to prevent persons from entering at will.

Plaintiff was 9 years and 11 months of age at the time of his injury. He testified that with his family he had moved into the area near the golf course a year or two before the accident, and that within a week or two after his arrival, encouraged by some of his young friends, he began searching for golf balls both outside and within the boundaries of the golf course. Upon finding a ball he would take it to the caddy house on defendant's property and there sell it to the caddy master or golf professional. No one there asked him where he found a ball and no one ever told him, while purchasing a ball, not to enter the golf course. He had played golf several times and knew that a golf ball would hurt him if it struck him. According to his testimony, he usually looked for balls in the street or in the ditch outside the fence, although the row of trees along the east boundary of the sixth fairway was a good place to look for lost balls and he sometimes went there, too, for that purpose; it was not his regular practice to go inside the fence, however, and he did not go out into the middle of the fairway, except on Mondays.

On the afternoon of the accident, Saturday, May 31, 1958, plaintiff and his 11-year-old brother had been searching for

balls outside the course, working their way north up the ditch between the wire fence and Rainier Avenue. When they saw two golfers approach the sixth tee they entered the golf course by crawling under the wire fence to look for golf balls around the row of trees; there was only a single strand of wire at the point where they went under. According to plaintiff, the boys stood just inside the fence, watching the golfers as they prepared to drive. He denied that they were on the fairway just before Moore's drive. Plaintiff knew that the golfer was going to hit the ball, so he stood beside one of the large trees in order that the ball would not hit him if it came his way. He did not see the ball actually leave the tee, but, wondering where it had gone, he looked around the tree in time to see the ball just before it hit him. The ball struck his left temple, causing a severe head injury. He fell against the wire fence.

The golfer Moore testified that at the time in question he and three companions had completed their play of the fifth hole and entered the tee area of the sixth, intending to tee off or drive down the sixth fairway toward the green. Moore was the first to drive. According to his testimony Moore saw two boys about 10 to 12 years of age standing in the center of the sixth fairway, about 200 yards south of the tee. He first shouted "fore," a signal which it appeared the boys did not hear or did not understand. He then shouted at them again several times, calling to them to leave the course. After some hesitation and a wait of from 30 to 45 seconds the boys left the fairway, disappearing from Moore's view to the east, into the row of trees at the edge of the fairway. Moore waited a few seconds and then drove his ball down the fairway. His shot traveled about 200 yards but hooked severely to the left into the row of trees where the boys had disappeared, at which point it appeared to Moore that it struck a tree trunk and then bounced back into the middle of the fairway.

The other members of the foursome completed their drives and the group proceeded about 200 yards down the fairway to the position of Moore's ball. As Moore was addressing his ball for a second shot his attention was called by one of the other golfers to the plaintiff, who was kneeling and sobbing near a tree, a foot or two inside the wire fence. Upon inquiry by the golfers, plaintiff's brother stated that plaintiff had been struck by a golf ball. Moore placed plaintiff in a motorized golf cart and rushed the boy to his home, a block or two east of the course.

Upon the foregoing evidence, in part summarized, the trial court, upon plaintiff's request, instructed the jury as follows:

"If you should find from the evidence that plaintiff child's presence on the property of the defendant country club, at the time of the happening of the accident now in question was occasioned by the fact that the plaintiff had gone upon the property for the purpose of finding golf balls and then selling the golf balls at the caddy house to the golf professional, or his agent, or agents, then you are instructed that the plaintiff was a business visitor and an invitee and that each of the defendants owed to him the duty of exercising ordinary care for his safety and that the failure to exercise such ordinary care, if any you find, would constitute negligence."

The ground for reversal urged by defendant is that since it was the function of the jury, as the finder of fact, to determine whether or not the plaintiff was an invitee, the trial court, omitting the factor of invitation, invaded the province of the jury in advising the jury that plaintiff was an invitee if the jury found that plaintiff had gone upon defendant's property for the purpose of finding golf balls and then selling the balls at the caddy house to the golf professional or his assistant.

There is no dispute as to the basic legal principles which are applicable. ■ An invitee or business visitor is a person who goes on the premises of another at the other's invitation, express or implied, and whose presence there is to their mutual interests. (Rest., Torts, § 332: *Powell* v. *Vracin,* 150 Cal.App.2d 454, 456 [310 P.2d 27].) ■ The invitation may, of course, be implied from such circumstances as the conduct of the possessor, the arrangement of the premises, or local custom. (*Oettinger* v. *Stewart,* 24 Cal.2d 133, 136 [148 P.2d 19, 156 A.L.R. 1221].) ■ The two ultimate facts establishing status as an invitee insofar as the present case is concerned are, therefore, invitation and business purpose. As we have pointed out, plaintiff here concedes that the instruction given omits the invitation aspect of the doctrine, but contends that there was no error in the giving of the instruction because the invitation was established as a matter of law by undisputed evidence.

■ It is of course fundamental that the question whether at the time of an injury the injured person was an invitee on land in possession of another is a question of fact. (*Cain* v. *Friend,* 171 Cal.App.2d 806, 808 [341 P.2d 753].)

■ Where the evidence is in conflict regarding the facts and circumstances of one's status as an invitee, that question of fact is for the jury to determine, under proper instructions as to the applicable law. (*Weyburn* v. *California Kamloops, Inc.*, 200 Cal.App.2d 239, 243 [19 Cal.Rptr. 357].)

■ The rule is settled, too, that one may be an invitee as to one portion of the premises, but a trespasser as to other portions, and that the question as to the extent of the invitation, where the evidence is in conflict, is one of fact for the jury and not a question of law. (*Maynard* v. *Walker*, 175 Cal. App.2d 145, 147 [345 P.2d 478]; *Billeter* v. *Rhodes & Jamieson, Ltd.*, 104 Cal.App.2d 137, 144 [231 P.2d 93].)

It is clear, of course, that the court must instruct only on material issues disputed by relevant and conflicting evidence (*Popejoy* v. *Hannon*, 37 Cal.2d 159, 167 [231 P.2d 484]), and that it is therefore erroneous to instruct on an issue resolved by undisputed evidence (*People* v. *Geijsbeek*, 153 Cal.App.2d 300, 309 [314 P.2d 21]). We have concluded, however, from our examination and analysis of the evidence herein, with its permissible inferences, that no such unequivocal situation faced the trial court.

■ It was established without conflict that for over 30 years the club's authorized representatives had, at the caddy house, purchased golf balls from boys in the neighborhood, and that on occasion members of the club and other golfers purchased balls from boys on the course itself. It was further established without direct contradiction that plaintiff had retrieved balls for that purpose, both on and off the course proper, since moving to the neighborhood of the club, and that he, himself, had never been questioned concerning the source of the balls or ordered to stay off the course. This evidence, however, neither by itself nor in combination with the other evidence on the issue of invitation leads inescapably to the single conclusion urged on plaintiff's behalf.

■ Here the evidence which was probative against the contention that the presence of plaintiff on the golf course was permissive shows that the course, in the area where the accident occurred, was fenced with barbed wire. Near the entrance to the course at that point a warning sign war in place. While the trier of fact may have been no more persuaded as to the effect upon or meaning of such a sign to a fourth-grade child than by the golf professional's bare conclusion that he had "never encouraged or knowingly permitted boys to come onto the course," it does not follow that the

sign's presence, as a matter of evidence, was of no substantiality at all, particularly in the presence of the other evidence negativing invitation. Golfers and caddies uniformly expelled boys who came onto the course. The golf professional and his assistant warned the boys to stay off the course. Plaintiff was himself ordered off the course by golfer Moore immediately before the accident; plaintiff left reluctantly, after some delay, and did not remove himself completely from the course, although forewarned of the danger and ordered to leave. Plaintiff's mother had warned him to stay off the fairways, and his teacher had warned him also of the danger present on the course.

Among the inferences which could be drawn from the evidence the jury could have inferred that plaintiff, living close to the golf course and having been there many times, must have known the meaning of the warning sign and the purpose of the fence; he must have been aware of the attitude of golfers toward the presence of children on the course; he must have known that he was not permitted upon the course, especially when play was in progress; and he must have been aware of the possible dangers which faced him on the course. It could not be said as a matter of law what effect such factors had upon plaintiff's status or conduct. As was said in *Roberts* v. *Del Monte Properties Co.*, 111 Cal.App.2d 69, a case involving a 7-year-old plaintiff, at page 74 [243 P.2d 914]: ''... In each case the reasonableness of the conduct under all the circumstances is for the jury and accordingly it was also in this case correctly left to the jury.'' The jury could have inferred that it was not reasonably expectable, particularly while play was in progress, that a boy would be on that part of the course which was close-cropped and upon which golf balls were not likely to be lost. The jury could have inferred, as defendant suggests, that by purchasing balls at the caddy house the actual effect was to discourage boys from coming onto the playing areas to sell balls to players, since the boys could and did walk down the road in relative safety to the caddy house without trespassing upon the playing areas. The photographs in evidence (particularly plaintiff's exhibit number 5) furnish ground for further inference. They disclose that there is no thicket or group of trees along the east boundary where plaintiff was injured, but rather a single row of trees, well and evenly spaced in single file, and growing almost directly upon the boundary line of the club property. One of the witnesses testified that at many points the distance between the trees and the wire fence was

just a matter of inches. They reveal also the sparseness of thick or high grass inside the wire fence, among the trees, and show the profuseness of growth outside the fence, in the area of the ditch, where the grass was not cut. ■ Finally, the evidence of custom is not to be disregarded on the question whether the absence of gates and watchmen and the inadequacy of the fencing were factors in attracting or inviting the boys within the boundaries of the course—particularly in the light of the known fact that even fences of considerable height and strength do not always deter inquisitive or trespassing children.

■ We do not purport to weigh or resolve the conflicts which the evidence discloses; we hold only that the question whether plaintiff's presence upon the golf course at the time in question was or was not with the permission, or at the invitation of defendant, express or implied, should have been left to the jury.

■ Plaintiff questions whether defendant may now complain of the challenged instruction, since defendant failed to request an instruction concerning the scope of the invitation. It is contended in this connection that the open invitation created by the practice of purchasing golf balls extended, as a matter of law, to the areas immediately surrounding the places where boys might reasonably have searched for lost golf balls (citing *Crane* v. *Smith*, 23 Cal.2d 288, 300 [144 P.2d 356]; and *Gardner* v. *Stonestown Corp.*, 145 Cal.App.2d 405, 414 [302 P.2d 674]). However, an erroneous instruction, assuming as a fact a matter in controversy, may always be challenged on appeal although no request to modify the instruction or to give another in its place was made. (*Rivera* v. *Parma*, 54 Cal.2d 313, 316 [5 Cal.Rptr. 665, 353 P.2d 273].)

■ Further, the rule that an appellant who neglected to request an instruction based upon his theory of the case cannot complain of respondent's instructions does not apply in case of a failure to submit to the jury the question as to whether the disputed facts, which would support the legal principle set forth in the instructions, had been established. (*Clarke* v. *Volpa Brothers*, 51 Cal.App.2d 173, 179 [124 P.2d 377].)

Plaintiff asserts, as a second or alternative contention, that his exact status on defendant's property was immaterial in any event; that defendant owed him the duty of ordinary care whether he was an invitee or a trespasser; and that defendant was not prejudiced, therefore, by any error in the

challenged instruction which after all only imposed upon defendant the duty of ordinary care toward plaintiff (citing *Fernandez* v. *American Bridge Co.*, 104 Cal.App.2d 340, 343 [231 P.2d 548]). In *Fernandez* it was said, at page 343: "The California rule seems to be that, regardless of the status of a plaintiff as licensee, trespasser or invitee, where defendant knew, or should have known, of plaintiff's presence, the duty of reasonable care was owed to him. [Citations.]" This is, of course, a fundamental rule. But application of the rule in a particular case, as implied in *Fernandez*, depends upon the establishment of *some* status or relationship—whatever its facts or its appellation—which imposes a standard or duty of care. Plaintiff's position in the instant case is predicated upon the rule of law which requires the owner of land to exercise reasonable care in the conduct of activities on property with respect to known trespassers or trespassers whose presence can reasonably be expected. Here again, however, plaintiff's contention ignores the fact that there was substantial evidence negativing the fact that he was a known trespasser or that his presence was reasonably to be expected at the place of accident. In support of his argument plaintiff has cited a number of cases in which trespassers, both adult and minor, have recovered for injuries received by reason of a dangerous condition of property (*Chance* v. *Lawry's, Inc.*, 58 Cal.2d 368 [24 Cal.Rptr. 209, 374 P.2d 185]); a live electric wire lying upon property (*Davoust* v. *City of Alameda*, 149 Cal. 69 [84 P. 760, 9 Ann.Cas. 847, 5 L.R.A. N.S. 536]); a dangerous animal (*Radoff* v. *Hunter*, 158 Cal.App.2d 770 [323 P.2d 202]); a railroad train at a place of known and constant trespass by children (*Staggs* v. *Atchison, Topeka & S. F. Ry. Co.*, 135 Cal. App.2d 492 [287 P.2d 817]); and many other cases involving dangerous conditions of property or the conduct of dangerous activities thereon.

We have examined the many cases cited by plaintiff. Without assuming their applicability here—because we believe the analogies fail in their facts—we point out that in each of the cases examined the factual question or issue posed, whether of the existence or extent of danger, the reasonableness of warning, the status of plaintiff, or the existence or breach of a duty of care, were determined properly to be for the trier of fact. In the instant case, however, the record demonstrates that the question whether plaintiff was a known or an expectable child trespasser, as he contends, was

removed from the jury's consideration just as effectively as was the invitation aspect of his status as an invitee.

The trial court instructed the jury that "A trespasser is a person who goes upon the land or premises of another without invitation, privilege or consent," and further gave the following instruction responsive to the pleadings, the evidence, and plaintiff's alternative contention that he was a trespasser in areas in which defendant should have known of his presence as a trespasser: "I instruct you that if you find that the defendants had known for a long period of time that children had come in, on or about the golf course, for the purpose of finding golf balls and in turn selling them at the caddy house, or to members of the golf club for a consideration, then I instruct you that it would have been the duty of the defendant, or defendants, who possessed such knowledge, to exercise the duty of ordinary care toward such children of tender years, even if you should, under these circumstances, find that such children of tender years were trespassers at the time."

In addition, however, the trial court, in a following instruction advised the jury: "It was the duty of the defendant, Stockton Golf and Country Club, in the conduct of any active operations on its property, to use the [*sic*] ordinary care to avoid injury to the plaintiff."

The two instructions just preceding are not only inconsistent in regard to the task to be performed by the jury, but the second of them removes from the jury's consideration the question whether under this theory of the case defendant owed plaintiff the duty of ordinary care; the jury was instructed positively that defendant did owe such duty to plaintiff. The result, of course, is that the trial court—as to this theory also—denied defendant its right, upon conflicting evidence, to have the facts upon which such a duty depended determined by the jury.

Moreover, the verdict cannot be supported in any event upon the alternative theory. While it is true that a judgment will not be reversed by reason of an erroneous instruction if there is substantial evidence to support the verdict on any theory unaffected by error (*Reagh* v. *S. F. Unified School Dist.*, 119 Cal.App.2d 65, 74 [259 P.2d 43]), that rule is not applicable to a case in which the jury has been precluded by erroneous instructions from considering a valid theory upon which a result different from that actually reached might have been supported, and error in such a case

is not cancelled by the fact that the jury might have found for the plaintiff on some other ground. ▮▮▮▮ "... Where, as here, the error consisted in instructing the jury as a matter of law on a question that is one of fact on conflicting evidence, and a determination favorable to the losing party might have been made if the error had not been committed, that error is prejudicial. [Citations.]" (*Clement* v. *State Reclamation Board*, 35 Cal.2d 628, 644 [226 P.2d 987].)

We have not heretofore referred specifically to a Michigan case (*Lyshak* v. *City of Detroit*, 351 Mich. 230 [88 N.W.2d 596], two cases, consolidated), upon which plaintiff relies for support in his contention that defendant owed plaintiff, as an expectable child trespasser, the duty of ordinary care. In that case, well reasoned on its facts, involving an injury to a 7-year-old boy who was struck by a driven golf ball while standing in the middle of a fairway on the golf course of defendant city, the plaintiff was a known trespasser. The boy was in full view of the golfer at the moment of his drive and did not move rapidly enough to avoid the ball in its flight down the fairway. The golfers in the group were there found to be joint adventurers and agents of the city, which owned the golf course. The jury properly found that the golfer owed the injured plaintiff a duty of ordinary care which was breached, in the circumstances, by the golfer, and, under the doctrine of respondeat superior that his principal, the municipality, was liable for damages. The trial judge directed a verdict for defendant city notwithstanding a verdict against it, and the Supreme Court of Michigan reversed, holding that the question of the city's negligence was for the jury to decide. The principle of law relied upon was stated to be that " 'Where a trespasser is discovered upon the premises by the owner or occupant, he is not beyond the pale of the law, and any negligence resulting in injury will render the person guilty of negligence liable to respond in damages.' " (*Lyshak* v. *City of Detroit, supra*, p. 607 [88 N.W.2d].) The case is no more than superficially analogous to the instant case. In our case the negligence of the golfer is not before us; the jury's verdict removed it from our consideration and plaintiff has not appealed from that finding. To accept plaintiff's argument would require us to hold that there was a positive duty imposed upon defendant to exercise reasonable and ordinary care in the control of the activities in question upon its property by denying defendant its right to have the jury determine, upon conflicting evidence, the question whether defendant knew or was chargeable with knowledge of

the presence of plaintiff upon defendant's golf course.

In view of the conclusions which we have reached as to the matters above discussed, it is not necessary for us to consider other contentions of defendants bearing upon plaintiff's alleged contributory negligence, assumption of risk and excessiveness in the award of damages.

The judgment is reversed.

Pierce, P. J., and Friedman, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 4, 1963.