VILLAGE DEVELOPMENT CO., a Corporation, Appellant, *v.* GENNARO A. FILICE and MERLE FILICE, Respondents.

No. 6759

GENNARO A. FILICE and MERLE FILICE, Appellants, *v.* VILLAGE DEVELOPMENT CO., a Corporation, and G. R. CAMPBELL, Respondents.

No. 6596

August 27, 1974                    526 P.2d 83

[Rehearing in Case No. 6759 denied November 5, 1974]

*McDonald, Carano, Wilson & Bergin,* of Reno, for Village Development Co.

*Cox, Cummins, Rinehart & Lamphere,* of Martinez, California, and *Sinai and Sinai,* of Reno, for Gennaro and Merle Filice.

*Breen, Young, Whitehead & Hoy, Chartered,* of Reno, for G. R. Campbell.

## OPINION

By the Court, GUNDERSON, J.:

Appealing a judgment entered upon a jury verdict for $99,-157.41 compensatory and $50,000 punitive damages, occasioned by selling respondents Gennaro and Merle Filice a residential building lot situated in the flood plain of a mountain stream, the appellant in Case No. 6759, Village Development Co., contends the district court erred in these ways, among others:

(1) in denying Village Development Co. a summary judgment after granting one to its sales agent, G. R. Campbell;

(2) in instructing the jury concerning the Filices' claim of negligence; and

(3) in permitting the jury to award punitive damages.

In addition to evidence of negligence imputable from Campbell, we think the record contains substantial evidence to show Village Development Co. negligently failed to warn the Filices that the proposed location of their home was unsafe and not the building site Village Development Co. contemplated when subdividing the land. Accordingly, perceiving no prejudicial error in presenting negligence issues to the jury, we affirm the compensatory damage award. However, perceiving no misconduct of sufficient magnitude to warrant imposition of punitive damages, we reverse that portion of the judgment.

Second Creek, at Incline Village, Lake Tahoe, is usually quite narrow. However, according to studies one John Webster Brown made for Washoe County, and according to the Filices' expert witness Jones, the width of the stream will vary radically under various storm conditions of given "return frequencies." As the record explains, a "return frequency" is the statistically calculated chance that a given runoff volume will occur. A 100-year storm would be expected once every 100 years; a 25-year storm, every 25 years. There would be a 4 percent chance of a 25-year storm, in any given year. These are merely statistics. A 5-year storm could occur every year for 5 consecutive years, or oftener.

Witness Brown's study included a calculation made approximately 100 feet upstream from the property Village Development Co. sold to the Filices, determining the creek would

spread westerly from the mid-point of its bed, 56 and 39 feet under 100 and 25-year return frequencies, respectively. Using Brown's data, witness Jones calculated the same westerly spread at the Filice property. According to Jones, the entire area occupied by the Filice house, constructed on the property Village Development Co. sold them, lay within the drainage-way for the 5-year storm. In other words, statistically, one cognizant of the danger might expect the home to be inundated on an average of once every 5 years.

Responsible officers of Village Development Co. knew at least generally of the danger. While employed as the corporation's vice president, Raymond Smith designed the subdivision. He described the central portion of the property, where respondents built their home, as being below the "first terrace" adjacent to the street. Smith testified he believed the flood plain extended "up to the first terrace," and Jones confirmed this belief, testifying:

"This whole area in here, from somewhere near the rear property line to where the ground approaching the street evens up, has every appearance of what I would determine a creek bed, although I can certainly see that people investing in this property would think of the smaller 'v' perhaps as being just the creek bed, because this is the part of the whole width, which would be occupied by the water most of the time and, in fact, a small babbling creek coming down to the property."

However, despite a westerly spread of more than 56 feet under the 100-year storm condition (almost equally bad in a 5-year storm), and despite Smith's knowledge of the area's flood plain character, Village Development Co. imposed no building restrictions other than one requiring that building plans be submitted to its Architectural Control Committee. Apparently, a county ordinance imposes a 30-foot setback requirement, applicable to the front of the property. The record reflects that the creek bed is actually in front of this setback line for most of its course through the property. The developer provided no warning of the condition on any document or map.

Knowing the flood hazard, Village Development Co. envisioned the highest possible site. Smith, its designer and vice president, testified he customarily designed lots with building sites in mind, and that for the property sold the Filices he contemplated construction on the "terrace" adjacent to the road. However, admittedly he informed no one of this, although he recognized the potentiality of inundation from the creek. He said he considered that "the building sites close to the road,

in which the normal building site is located, would escape flood damage."[1] (To build on what Smith called the "normal building site," the Filices would have had to apply for a zoning variance, relieving them of setback requirements, another fact never revealed to them.)

Village Development Co.'s president, Arthur Wood, likewise testified that although he believed the home would have escaped damage if built on the "terrace" as he also thought advisable, he never told the Filices his thoughts concerning this proper building site. In short, the corporation's highest management personnel failed to warn of the danger although they well knew the Filices were planning to build in the flood plain, as evidence now to be summarized shows.

The record reflects that during a Christmas holiday at Lake Tahoe, the Filices met Campbell, the sales agent, and explained to him a desire for a building lot affording seclusion, tree cover, and a creek-side setting. About a week later, Campbell telephoned the Filices at their home in Orinda, California, telling them he had property he thought met their desires. Ultimately, the Filices purchased the property Campbell suggested, after he took them to it, directed their attention to the low, flat area beside the creek, and assured them that "he had lived there for some years and that he had talked with other people and that the creek never varied more than a few inches, season by season, year by year."

The Filices retained a local architect to prepare plans. However, before construction, the plans had to be approved by Village Development Co.'s Architectural Control Committee, established pursuant to restrictions contained in every deed. When the Filices' plans were submitted, this committee consisted of Mr. Wood, Mr. Harold Tiller, and Mr. Leonard Bowser. Customarily, plans were primarily reviewed by Bowser, an employee of Village Development Co. who testified to being a licensed land surveyor in California and Nevada, and a member of the Nevada State Board of Registered Engineers. The explanation for Bowser's primary role in reviewing plans was his engineering background. The committee's approval was indicated with his initials. By virtue of the recorded restrictions, the committee had power to withhold approval upon

[1] Inter alia, Smith testified: "Q. And so, could it be said that you did think of the potentiality of some inundation to the creek, but the building sites close to the road were high enough that it wouldn't be affected by such a flooding? A. Yes. Q. Mr. Smith, did you ever convey your thought in that regard to anyone? A. No."

reasonable dissatisfaction with location of the structure upon the building site.[2]

It seems that during its review, the Architectural Control Committee discussed the proposed location of the Filices' home, and Wood urged Bowser to tell them to build higher on the lot.[3] Although Bowser testified he did not recall this conversation with Wood, he remembered approving the Filices' plans. Village Development Co.'s former vice president, Smith, testified he believed an architectural review provision should take into account protection of a residence from a possible flood. Still, despite recognized potentiality of flooding to the property sold to the Filices, it seems clear the corporation's Architectural Control Committee approved their plans with no warning whatever.

On August 25, 1967, the Filice residence was destroyed by a flow of water carrying a great amount of mud, trees and other debris. In briefs and oral argument, Village Development Co.'s counsel dwell on the supposed fact that the particular storm which destroyed the dwelling was of unusual size. Yet, according to testimony in the record, had the house been inundated by any of the many floods reasonably to be anticipated, substantial destruction was to be anticipated, even without taking into account the inevitable debris such flood waters contain.

1. Where no basis exists to charge an employer, other than vicarious liability for the imputed negligence of its agent, courts often have held that a judgment on the merits in the agent's favor bars further action against the employer. Kraft v. Montgomery Ward & Co., 348 P.2d 239, 248 (Ore. 1959); Brink v. Martin, 310 P.2d 870, 871 (Wash. 1957); Spruce v. Wellman, 219 P.2d 472, 474–475 (Cal.App. 1950); Freeman v.

---

[2]The recorded restrictions stated:

"Committee approval may be withheld . . . (b) because. of the reasonable dissatisfaction of the Committee with the location of the structure on the building site . . ."

[3]Wood testified:

"Q. Sir, do you recall, that when Mr. Filice's plans were submitted to the Architectural Control Committee, did you discuss it? A. They were discussed. Q. They were discussed. Now, is it true, Mr. Wood, that, in reviewing Mr. Filice's plan for approval, in the Architectural Control Committee, you urged Mr. Bowser to tell Mr. Filice to build higher on the lot? A. Yes. . . . Q. All right. Do you know whether Mr. Bowser conveyed your thoughts, in that regard to the Filices? A. I do not know. Q. Or any agent of the Filices? A. I do not know."

Churchill, 183 P.2d 4, 8 (Cal. 1947). Here, however, contrary to Village Development Co.'s contention, this rule could find no application; for as indicated above there is ample evidence of the corporation's negligence, independent of any on the part of its agent Campbell. Cf. Eckleberry v. Kaiser Foundation Northern Hospitals, 359 P.2d 1090, 1096–1097 (Ore. 1961).

2. Village Development Co. further contends the trial court erred by refusing to give its proposed Instruction E, which contains language taken from Sections 352 and 353 of the American Law Institute's "Restatement of Torts," concerning a land vendor's duty to warn the purchaser of concealed danger.[4] Our brother Thompson, who agrees, apparently also thinks the trial court should have instructed in the language of Section 351.

Concerning the court's instructions relating to a land vendor's liability, at the outset we note that it may be questioned

---

[4]Village Development Co.'s proposed Instruction E recited:

"Except as stated below, a vendor of land is not liable for physical harm caused to his vendee while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession:

"(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if,

"(a) the vendee does not know or have reason to know of the condition or the risk involved, and

"(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

"(2) If the vendor actively conceals the condition, the liability stated above continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions."

In Kimberlin v. Lear, 88 Nev. 492, 495, 500 P.2d 1022 (1972), this court recognized that failure to disclose a concealed condition involving unreasonable danger, which the vendee may not discover, may render the vendor liable for resulting injury to the vendee and others upon the land with the vendee's consent. However, although the majority opinion alluded to Section 353 of the Restatement, it of course never suggested that a court must always advise the jury of every limitation upon the vendor's liability which the American Law Institute's abstract recapitulation of the law includes. Nor does our *Kimberlin* decision mandate only instructions in the words which the American Law Institute saw fit to employ.

whether any claim of error has properly been preserved for review. NRCP 51 declares no party may assign the giving or failure to give an instruction as error, unless in objecting thereto he states "distinctly the matter to which he objects and the grounds of his objection." A general objection made by Village Development Co.'s counsel (i.e. that the trial court's Instruction No. 24 was "not a proper statement of the applicable law" and that proposed Instruction E was) arguably failed to comply with NRCP 51. See, for example, Apperwhite v. Illinois Central Railroad Company, 239 F.2d 306, 310 (8 Cir. 1957): "Moreover, the objection made to the charge, that is was 'not the true law', did not comply with Rule 51 of Fed. Rules Civ. Proc., and, in reality, the point is not properly preserved for our review." However, we prefer to pass any issue of this kind, and to treat the merits of the issues that concern our dissenting brother.

As noted, Chief Justice Thompson believes the jury should have been instructed in the language of Section 351, which recites the rather obvious and here inapplicable rule that a vendor has no liability for a condition "which comes into existence after the vendee has taken possession." In this case, clearly, the dangerous condition of the property, i.e. its location within the flood plain of Second Creek, came into existence before and not after transfer of possession.

In a unanimous opinion, less than three months ago, this court reiterated the universally recognized principle that "[a]n instruction need not be given when there is no proof in the record to support it." Singleton v. State, 90 Nev. 216, 220, 522 P.2d 1221, 1223 (1974). As another court recently said in facts closely analogous to those here concerned: "There can be no error in refusing to instruct on a proposition of law that has no application to the facts of the case." Williams v. Goodman, 29 Cal.Rptr. 877, 885–886 (1963). Quite to the contrary under many authorities, it would have been improper, and might have been prejudicial error, to instruct on the legal principles stated in Section 351. For example, in a unanimous *in bank* opinion the California Supreme Court recently said that generally: "Even though an instruction is couched in proper language it is improper, if it finds no support in the evidence, and the giving of it constitutes prejudicial error if it is calculated to mislead the jury." Solgaard v. Guy F. Atkinson

Company, 491 P.2d 821, 826 (Cal. 1971).[5] Thus, we fail to see how absence of an instruction on conditions arising after transfer could be prejudicial error.

Next, we turn to the trial court's refusal to give proposed Instruction E, containing language from Sections 352 and 353 of the Restatement. Section 352 states that as to conditions existing when the vendee takes possession, the vendor only has liability as stated in Section 353. Section 353(1) goes on to declare that a vendor who conceals or fails to tell his vendee of any condition, natural or artificial, involving unreasonable risk, is liable to the vendee and others on the land with consent if:

"(a) the vendee does not know or have reason to know of the condition or the risk involved, and

"(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk."

So far as we can perceive (and there has been no attempt to show otherwise), the trial court's Instruction No. 24 told the jury all of this.[6] Although counsel for Village Development

---

[5] In accord, see also:

Clawson v. Stockton Golf and Country Club, 34 Cal.Rptr. 184, 191 (Cal.App. 1963): "It is clear, of course, that the court must instruct only on material issues disputed by relevant and conflicting evidence . . . and it is erroneous to instruct on issues resolved by undisputed evidence."

DeGeorge v. Crimmins, 62 Cal.Rptr. 394, 396 (Cal.App. 1967): "Such instructions, unrelated to the issues, and unsupported by the evidence, in our opinion, were likely to confuse and mislead the jury. . . . 'An instruction if not applicable to the facts proved and the issues raised by the pleadings may easily mislead the jury.' [Citing authorities]."

Decker v. Korth, 219 F.2d 732, 738 (10 Cir. 1955): "Instructions must be predicated on the evidence. They may not deal with general or abstract propositions not immediately connected with and applicable to the facts before the jury."

Popejoy v. Hannon, 231 P.2d 484, 489 (Cal. 1951): "The evidence is uncontradicted that, when the lumber started to fall, Popejoy was on the hyster and operating it to the mutual benefit of Sugerman and the Hannons. The record, therefore, includes no evidence which would justify giving the instructions requested by the Hannons to the effect that the invitation to Popejoy to be upon the premises excluded his operation of the hyster."

[6] Instruction No. 24 recited as follows:

"*One who* designs, develops and *sells a lot in a residential subdivision* directly or through a third person, for another to buy and use for the construction of a residence *which the developer knows or has reason to*

Co. has vaguely complained that Instruction No. 24 imposes "strict liability," it seems to us that, like the Restatement's Section 353(1), Instruction No. 24 declares liability exists only if (a) it does not appear the vendee will realize the danger, and (b) the vendor knows or has reason to know of the danger. Moreover, in the usual way, the trial court instructed the jury that contributory negligence on the part of the Filices would bar any recovery. Thus, concerning any linguistic difference between Sections 352 and 353(1), and the court's Instruction 24, the words of our brother Thompson in Duran v. Mueller, 79 Nev. 453, 386 P.2d 733 (1963), seem apposite:

"As a general proposition the number of instructions to be given is discretionary with the court. If one instruction adequately covers a given theory of liability or defense, it is preferable that the court refuse additional instructions relating to the same theory, though couched in different language." 79 Nev. at 460; 386 P.2d at 737. In accord, see opinion of Thompson, C. J., in Eikelberger v. State ex rel. Dep't Hwys., 83 Nev. 306, 429 P.2d 555 (1967).[7]

---

*know is dangerous or is likely to be dangerous for that use, has a duty to use reasonable care to give warning* of the dangerous condition of the lot or of facts which make it likely to be dangerous to those whom he should expect to use the lot. A failure to fulfill that duty is negligence. *If, however, the developer has reason to believe that the user of the lot will realize its dangerous condition, he has no duty to warn.*

"A lot is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary purchaser who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Emphasis added.)

[7]Also in accord, see:

Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 415, 470 P.2d 135, 139 (1970): "Appellant complains the given portion [of a proposed instruction] is couched in negative terms, while the omitted portion imports the positive duty. While we would have been inclined to state the invitor's duty in positive rather than negative terms, the trial court did not commit error in refusing to do so. [Citing authorities.]"

Southern Pacific Co. v. Watkins, 83 Nev. 471, 493, 435 P.2d 498, 512 (1967): "A reading of these instructions shows that the jury was adequately instructed in this case. It is not error to refuse instruction where its substance is adequately covered in other instructions. [Citing authorities.]"

Cucamonga County Water Dist. v. Southwest Water Co., 99 Cal. Rptr. 557, 573 (Cal.App. 1971); Wright v. Marzo, 427 F.2d 907, 910–911 (10 Cir. 1970); Arkwright Mutual Insurance Co. v. Philadelphia Electric Co., 427 F.2d 1273, 1277 (3 Cir. 1970); Shaw v. Lauritzen, 428 F.2d 247, 251 (3 Cir. 1970); Wolff v. Commonwealth of Puerto Rico, 341 F.2d 945, 946 (1st Cir. 1965); Alexander v. Kramer Bros. Freight Lines, Inc., 273 F.2d 373, 375 (2 Cir. 1959).

Finally, we note appellant's proposed Instruction E concluded with language from Section 353(2) of the Restatement, to wit:

"If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions."

In the instant case, the record does not indicate the Filices had reason to anticipate danger, before their home was destroyed. Nothing indicates they had "a reasonable opportunity to take effective precautions"; indeed, nothing establishes "effective precautions" were possible once Village Development Co. permitted the Filices to build their home in the flood plain. Moreover, as noted, a contributory negligence instruction was given in the usual form. Therefore here, so far as we can see, an instruction in the language of Section 353(2) was not essential to performance of the jury's duty. Cf. American Cas. v. Propane Sales & Service, 89 Nev. 398, 513 P.2d 1226 (1973).

As appellant, of course, Village Development Co. has the burden of demonstrating prejudicial error. Meinhold v. Clark County School Dist., 89 Nev. 56, 61, 506 P.2d 420, 423 (1973). In our view, this burden has not been met, in regard to the court's instructions concerning land vendors' duties.

3. We have considered appellant's other assignments of error, and believe none require discussion, except for Village Development Co.'s contention that its conduct does not warrant punitive damages, which we believe has merit.

The record contains evidence to show negligence and unconscionable irresponsibility. Still, after careful consideration and extensive debate, we find insufficient evidence to support a finding of "oppression, fraud or malice, express or implied." NRS 42.010. We have heretofore sustained awards of punitive damages where evidence showed the wrong was willful, and damage either intended or a necessary consequence. Here, however, the evidence does not to us appear quite sufficient to meet our previously established requirement that more must be shown than malice in law, and that there must be substantial evidence of malice in fact. See: Nevada Credit Rating Bureau

v. Williams, 88 Nev. 601, 503 P.2d 9 (1972); Nevada Cement Company v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973).

In view of the foregoing, therefore, in Case No. 6759 the judgment for compensatory damages is affirmed, and the judgment for punitive damages is reversed. In Case No. 6596, the Filices have appealed a summary judgment absolving Campbell of liability and, as well, a summary judgment precluding trial against any defendant on a theory of strict liability. In accord with statements of the Filices' counsel that Case No. 6596 was docketed in this Court solely in anticipation of the appeal in Case No. 6759, Case No. 6596 is hereby dismissed. As to both appeals, the parties will bear their own costs.

MOWBRAY, BATJER, and ZENOFF, JJ., concur.

THOMPSON, C. J., dissenting in part:

On August 25, 1967, a convective storm occurred causing a flash flood of water, mud and debris to overflow the channel of Second Creek and totally destroy the summer home of Gennaro and Merle Filice at Incline Village, Lake Tahoe, Nevada. They commenced this action to recover compensatory and punitive damages for their loss.

Among others, they named as defendants Village Development Co. and G. R. Campbell.[1] Village Development planned and developed the subdivision within which the Filice home was constructed. G. R. Campbell was the sales representative of Village Development who sold the subdivided lots to Mr. and Mrs. Filice. As to each, the plaintiffs asserted alternate theories for recovery; fraudulent misrepresentation, negligence and strict liability. Before trial, the district court granted summary judgment to Campbell on all theories of liability asserted against him, and also granted summary judgment for Village Development as to the strict liability count.

The case proceeded to jury trial against Village Development on two theories, fraudulent misrepresentation and negligence. The jury returned a general verdict for the plaintiffs awarding compensatory damages of $99,157.41 and punitive damages in the amount of $50,000.

The Filices have appealed from the summary judgment absolving Campbell of liability and, as well, from the summary judgment precluding trial upon its theory of strict liability

---

[1]Village Development succeeded to the interest of Crystal Bay Development with whom the plaintiffs dealt. For simplicity, I shall refer throughout only to Village Development.

against Village Development. Village Development has appealed from the judgment entered upon jury verdict. The two appeals were consolidated for argument and decision.

1. *Appeal No. 6759:* Village Development v. Filice.

(A). One of the several assignments of error concerns the basic insruction given to the jury on the negligence theory of liability together with the refusal of the court to instruct on that subject in the manner proposed by Village Development. It is Nevada law that substantial error in the charge of the court as to one of the alternative theories of liability requires remand for another trial if the jury returned a general verdict thus rendering it impossible to determine the basis for the jury result. Lightenburger v. Gordon, 81 Nev. 553, 579, 407 P.2d 728 (1965); Otterbeck v. Lamb, 85 Nev. 456, 463, 456 P.2d 855 (1969).

In capsule form, the facts relevant to negligence are these. In 1963, the Filices looked for property to buy in the Lake Tahoe Basin. They desired a home set back from the street with tree cover and a creek. They contacted Campbell, a sales representative of Village Development, who showed them two lots in Ponderosa Subdivision No. 4 at Incline Village. That subdivision had been designed, planned and developed by Village Development. The lots pleased the Filices since Second Creek coursed through them and there was adequate tree cover.

Before deciding to purchase, they inquired of Campbell as to whether the creek would pose a problem with regard to "rising and falling," and were told by Campbell that "he had lived there for some years and that he had talked with other people and that the creek never varied more than a few inches, season by season, and year by year." They purchased the lots, one from Village Development directly, and the other from a third person, and hired an architect to prepare plans and specifications for a home on the low portion of the property near Second Creek. Those plans were submitted to the Architectural Control Committee of the subdivider for its approval, and were approved. Arthur Wood, one of the three members of the Committee wished to have the home built on the higher part of the property in order that it would be more readily visible, and thus aid in selling other lots. His desire, however, was not transmitted to the Filices.

Raymond Smith, who was employed by Village Development to lay out the subdivision, acknowledged the potentiality of some inundation of Second Creek even though there had been no history of its ever having flooded.

The Filices then employed a contractor to build their home. They used the home for about two years and then listed it for sale. Before a sale was made the home was demolished by the August 1967 flood.

The convective storm commenced above the elevation where development activity had taken place. There was no recorded history of a similar occurrence on Second Creek. However, after the flood, expert witness hypothesized statistical information from which the jury arguably could infer that representatives of the subdivider should have known that the proposed location of the Filice home was within the flood plain of Second Creek. Moreover, there was substantial evidence to indicate that had their home been built on the elevated portion of their property it would have escaped damage.

These circumstances called for an instruction regarding the liability of a vendor of land who has parted with title, possession and control to his vendee, with regard to any concealed conditions known to the vendor which involve an unreasonable danger, and which he may anticipate that the vendee may not discover. Kimberlin v. Lear, 88 Nev. 492, 495, 500 P.2d 1022 (1972). Village Development offered such an instruction couched in language borrowed from Rest., Torts, 2d ed., §§ 351, 353.[2] That instruction was refused. In lieu thereof the court gave a products liability instruction [BAJI 9.20; Rest., Torts, 2d ed., § 388] apparently on the assumption that one

---

[2]Sec. 351: "A vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land by any dangerous condition, whether natural or artificial, which comes into existence after the vendee has taken possession."

Sec. 353: "(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

"(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions."

who develops and sells subdivided land stands in the same position as the manufacturer and seller of chattels. That instruction was reworded to make needed substitutions.

The law does not treat the vendor of land in the same manner as a seller of chattels.[3] Their duties and liabilities are not precisely the same. This error may not be cast aside as harmless since it bears directly upon duty and liability. Murdock v. Petersen, 74 Nev. 363, 332 P.2d 649 (1958).

(B). The possible liability of Village Development based upon fraudulent misrepresentation also was presented to the jury. As to this claim for relief it is asserted, among other things, that the evidence offered simply was too slim to allow any recovery.

---

[3]Prosser, Torts, 4th ed., at 412–413:

"The vendor of real property who parts with title, possession and control of it ceases to be either an owner or an occupier. Ordinarily, therefore, he is permitted to step out of the picture and shift all responsibility for the condition of the land to the purchaser. As to sales of land the ancient doctrine of *caveat emptor* lingered on, and is still very largely in force; and it is only in recent years, and then to a very limited extent that the implied warranties which have grown up around the sale of chattels have been parallelled as to land. This was perhaps for the reason that great importance is attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms; the lack of any standard marketable quality, or even standard use, of land; and the fact that the vendee normally inspects the property before purchase, and so is assumed to have accepted it as it is. Thus in the absence of express agreement or misrepresentation the purchaser is expected to make his own examination and draw his own conclusions as to the condition of the land; and the vendor is, in general, not liable for any harm resulting to him from any defects existing at the time of transfer. Still less is he liable to other persons who may come upon the land.

"With the passage of time, an increased regard for human safety, and a sadly needed improvement in bargaining business ethics, have led to the development of two exceptions to this once universal rule. One of them, which finds support in the cases of lessors, and in the Restatement of Torts, is that the vendor is at least under a duty to disclose to the vendee any concealed conditions known to him which involve an unreasonable danger to the health, or safety of those upon the premises, and which he may anticipate that the vendee will not discover. If he fails to make such disclosure, he becomes liable for injury resulting from such conditions to the vendee, or to members of his family, or others upon the land in the right of the vendee. The older view was to the contrary, and there are still courts whose latest decisions deny even this obligation; but the duty should certainly exist, if only because of the analogy to the "something like fraud" in permitting even a licensee to enter in the face of a concealed and undisclosed hazard, and because the risk to the vendee is clearly great in proportion to the relatively slight burden of disclosure cast upon the vendor.

"The recognition of this duty of disclosure has thus far ended the progress of any negligence liability of the vendor."

Clear and convincing proof must support a claim of fraud. Miller v. Lewis, 80 Nev. 402, 395 P.2d 386 (1964); Tallman v. First Nat. Bank, 66 Nev. 248, 208 P.2d 302 (1949); Gruber v. Baker, 20 Nev. 453, 23 P. 858 (1890). And, as we stated in Clark Sanitation v. Sun Valley Disposal, 87 Nev. 338, 341, 487 P.2d 337 (1971), "although this is primarily a trial court standard, its view of the matter is not necessarily conclusive since, upon review, we must consider the sufficiency of the evidence in the light of that standard, and where there exists no more than a paucity of evidence to support the charge of fraud, we will not hesitate to reverse. Nevada Mining & Exp. Co. v. Rae, 47 Nev. 182, 223 P. 825 (1924)."

The quoted language suits this case. The charge of fraud rested mainly upon two items of evidence. First, the statement of Campbell, as the sales representative of Village Development, that Second Creek did not vary more than a few inches year to year. Second, the concealment by Village Development of a material fact about which, inferentially, it should have had knowledge, namely, that the proposed location of the Filice home was within the flood plain of Second Creek.

There is no suggestion that Campbell's statement did not reflect his honest belief. Neither did representatives of Village Development know of prior floods of Second Creek. The evidence is otherwise. Cf. Villalon v. Bowen, 70 Nev. 456, 273 P.2d 409 (1954), where the failure to disclose the material fact of a known marriage was held to be fraudulent concealment. There was no history of similar floods on Second Creek. Whether the subdivider should have known and, therefore, foreseen the possibility of a convective storm and flood which would damage homes along Second Creek is a question bearing upon the issue of negligence. It does not give a basis for fraud.

(C). The jury assessed punitive damages of $50,000. This award is challenged as unlawful. NRS 42.010 allows punitive damages "in an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, express or implied." For reasons already expressed, I perceive no oppression or fraud in this case. The term "malice" as used in the statute means malice in fact and denotes ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it. Nevada Credit Rating Bur. v. Williams, 88 Nev. 601, 610, 503 P.2d 9 (1972). It contemplates willful and intentional conduct done in reckless disregard of possible results. Nevada Cement Company v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973).

An award of punitive damages was approved in the *Nevada*

*Credit Rating* case because the attachment of property there involved was far in excess of the debt and was made with the intent of pressuring payment. And, in the *Lemler* case, the defendant knew that if it continued to spew dust from its cement kiln that damage would ensue, but did so notwithstanding such knowledge. In each instance there existed a reasonable basis for the contention that the defendant's conduct was carried out in reckless disregard of the rights of the plaintiff.

Evidence of that kind is absent from the record before us. As a matter of law, punitive damages are not recoverable. To this extent, I agree with the majority opinion.

I would set aside the judgment upon jury verdict against Village Development and remand the case for a new trial on the issue of negligence alone.

2. *Appeal No. 6596.* Filice v. Village Development and Campbell.

In view of the majority opinion with regard to Appeal No. 6759, it is not useful to express my thoughts as to this appeal.